Walton, Appellant, *v.* Harold M. Kelly, Inc., Appellant.

Argued March 9, 1970.   Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and CERCONE, JJ.

*Norman T. Petow,* for claimant, appellant.

*Donn I. Cohen,* with him *Robert J. Stewart,* and *Liverant, Senft and Cohen,* for Harold M. Kelly, Inc., appellant.

*Robert J. Brown,* with him *Kain, Brown & Roberts,* for appellee.

OPINION BY WATKINS, J., September 18, 1970:

These are appeals from the decision of the Court of Common Pleas of Adams County reversing a finding by the Workmen's Compensation Board that an employer-employee relationship existed between the claimant's decedent, Lester Walton, and B. & P. Motor Express, Inc. in that the Board capriciously disregarded competent evidence; and the court below remanded the case to the Board for further consideration consistent with the court's holding.

Lester Walton, the decedent, was fatally injured in an accident on the Ohio Turnpike on April 19, 1965. At that time he was residing at R.D. 1, Abbottsville, Pennsylvania and was employed by Harold M. Kelly, Inc., as a tractor-trailer operator. He was operating a tractor trailer owned by Kelly and was transporting a load of steel coils from Baltimore, Maryland to Cleveland, Ohio through Pennsylvania under a "sub-lease"

with B. & P. Motor Express, Inc. The lease agreement between Kelly and B. & P. named Kelly as "owner"; and B. & P. as "lessee". The agreement was executed in Baltimore, Maryland and the decedent signed on behalf of Kelly. B. & P. Motor Express, Inc. is a Maryland corporation operating terminals in Pennsylvania. Kelly is a Pennsylvania corporation with its principal place of business in Oxford, Pennsylvania.

Walton's widow filed two claim petitions under the Workmen's Compensation Act. She filed one against Kelly and the other against B. & P. Both petitions were consolidated for hearing before a referee. The referee concluded that Walton was the employee of Kelly at the time of the accident. The Board, on appeal, reversed the referee and found B. & P. to be the employer and that the Workmen's Compensation Board had jurisdiction over B. & P. The court below, on appeal, reversed the Board holding that its decision was based solely on the agreement and the Board had capriciously disregarded competent evidence in coming to the conclusion of law that the employer-employee relationship existed between the claimant and B. & P. The court below remanded the case to the Board for further proceedings in accordance with the court's interpretation of the agreement. Kelly appealed from the decision of the Board; B. & P. appealed from the decision of the Board on the ground that the Workmen's Compensation Board did not have jurisdiction; and the claimant filed a protective appeal in the event the jurisdiction question must be met.

If the judgment of the court below is affirmed the question of jurisdiction by B. & P. need not be considered. The only question before us is whether the Board capriciously disregarded competent evidence in finding that B. & P. had complete control of Walton at the time of the accident. It is clear that the Board's finding is

based solely on interpretation of the trip lease. It found in its first opinion: "16. By the explicit terms of the trip-lease agreement between Harold M. Kelly, Inc. and B & P Motor Express, Inc. Kelly had surrendered to B & P the exclusive possession, control and use of the equipment being leased and the right to control the driver of the equipment." It is important to note that the findings of fact of the referee in its decision that Kelly was the employer were not reversed by the Board. The Board's decision was determined entirely on its interpretation of the lease. This was reaffirmed by the Board after rehearing.

The appeal raises two questions: (1) By whom was Walton employed at the time of the accident and (2) did the Workmen's Compensation Board have jurisdiction over B. & P.? If we affirm the court below as to Walton's employment by Kelly, it is not necessary to discuss the jurisdictional question.

As the court below said: "Our examination of that lease does not disclose any terminology which explicitly and clearly places the control of Walton in B. & P. The lease was a lease of equipment. The operator of that equipment is not mentioned anywhere in the lease. On the contrary, the lease specifically says that the lessor (Kelly) shall 'comply with all laws and regulations with respect to workmen's compensation insurance' and that the lessor (Kelly) will reimburse the lessee 'for any and all shortages, loss, damages or injury to cargo while in possession of (Kelly) *his* agents or employees' and that Kelly will reimburse B & P for fines resulting from violations of law by Kelly, '*his* agents or employees.' (Emphasis ours). It appears to us that under the holding in Mature v. Angelo, supra, Walton could not have been the employee of B & P. The factual presumption that the operator remains in the employ of his original master certainly is not rebutted

by the terms of the lease in this case. Furthermore, the plain words of the lease quoted above indicate that it was Kelly who was to comply with the workmen's compensation law, that Kelly was responsible for acts of his employees resulting in shortages, losses, damages or injuries to cargo and that Kelly was ultimately liable for any fines incurred by Kelly's employees while the equipment was being used by B & P."

Where responsibility for a lent servant is to be determined, the crucial or vital consideration is who had control or right of control over the employee as to the work to be done and the manner of its performance at the time of the accident. *Wall v. Penn Lumber and Mill Works,* 171 Pa. Superior Ct. 512, 90 A. 2d 273 (1952).

In *Mature v. Angelo,* 373 Pa. 593, 97 A. 2d 59 (1953) quoted in *Brasel v. Quickway, Inc.,* 205 Pa. Superior Ct. 593, 211 A. 2d 63 (1965), the Court stated: "One who is in the general employ of another may, with respect to certain work, be transferred to the service of a third person in such a way that he becomes, for the time being and in the particular service which he is engaged to perform, an employe of that person: . . . The crucial test in determining whether a servant furnished by one person to another becomes the employe of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it: . . . A servant is the employe of the person who has the right of controlling the manner of his performance of the work, irrespective of whether he actually exercises that control or not: . . . Where one is engaged in the business of renting out trucks, automobiles, cranes, or any other machine, and furnishes a driver or operator as part of the hiring, there is a factual presumption that the operator re-

mains in the employ of his original master, and, unless that presumption is overcome by evidence that the borrowing employer in fact assumes control of the employe's manner of performing the work, the servant remains in the service of his original employer: . . . The mere fact that the person to whom a machine and its operator are supplied points out to the operator from time to time the work to be done and the place where it is to be performed does not in any way militate against the continuance of the relation of employe and employer between the operator and his original master: . . ."

In *Rugh v. Keystone-Lawrence Transfer and Storage Company,* 197 Pa. Superior Ct. 526, 179 A. 2d 242 (1962), with factual setting somewhat similar to the case at bar, this court found that by the terms of his lease an owner-lessor of a tractor-trailer who was also its driver, surrendered a sufficient degree of control to have become the employee of the lessee. In this case, however, the lessee had the power to instruct the driver as to how to perform, what routes to take, and to reject any driver the lessor supplied. Further, the lease agreement specifically transferred the control of the vehicle and driver to the lessee. In the case at bar, these facts are not present. And further in this case the decedent was not only Kelly's employee, but his agent who negotiated the agreement and signed for Kelly.

The Board specifically found that the lease by its terms granted exclusive control to B. & P: It is, therefore, necessary to examine the evidence to see if, as the court below found, the Board capriciously disregarded competent evidence.

The sublease or interchange agreement provided as follows:

". . . The said equipment shall during the term of this lease be deemed to be under the exclusive posses-

sion, control and use of the lessee (except that lessee reserves the right to sub-lease said equipment). Lessor (Kelly) shall not use said equipment for his own use or benefit during the terms of this lease."

However, elsewhere in the agreement the lease provided that:

"2. Said described motor vehicle will be operated by *Second Party, his agent or employee* over the certified route of the First Party from BALTIMORE, MARYLAND to CLEVELAND, OHIO as specified and designated by First Party.

"5. Second Party (Kelly) agrees that he will at all times during the existence of this agreement keep said motor vehicle in good condition and repair, and that he will pay for any and all cost and fees of any kind of nature whatsoever which are necessary for or arise from the operation of said motor equipment between the named points.

"6. Second Party . . . will comply with all applicable laws and regulations with respect to Workmen's Compensation Insurance, unemployment insurance, old age pensions, or social security or withholding tax laws as to all persons engaged in the performance of this contract, it being understood and agreed that the relations between First Party and *Second Party shall be that of Employer-Employee* but that of *Second Party shall have at all times the status of an independent contractor.*

"7. Second Party agrees that he will reimburse First Party through deductions or payment for any and all shortages, loss, damages or injury to cargo while in the possession of Second Party, his agents or employees; or fines resulting from the violation by Second Party, his agents or *employees* of any applicable Federal, State or Municipal Law or Regulation." (Emphasis—The Writer)

Thus even from the terms of the lease it is clear that B. & P. agreed to lease a truck and driver and that it was to remain in the control of Kelly while enroute to Cleveland despite the language to the contrary. Kelly agreed to transport the cargo from Baltimore to Cleveland and received no specific instructions from B. & P. on how this was to be done. This conclusion puts the case within the holding of *Mature v. Angelo* (supra).

The terms of the lease are compatible with the facts found by the referee and not overruled by the Board. The following findings are pertinent:

"7. Harold M. Kelly, Inc., defendant, had advised all of his drivers that when they reached the Baltimore area they were to call one of several trucking concerns to determine whether or not a load could be obtained for carriage in the defendant Kelly's vehicle. One of the companies which was recommended by the defendant Kelly to be called was B & P Motor Express, Inc., the defendant in Claim Petition #185,565. It was standard operating procedure for the drivers of defendant Kelly, with the authorization and acting as an agent of Kelly, to call carriers to seek a load to avoid 'deadheading' back to Pennsylvania. On April 8, 1965, the decedent, as an agent of Harold M. Kelly, Inc., entered into a sublease agreement with the defendant, B & P Motor Express, Inc. which provides, among other things that the defendant Kelly leases a motor vehicle to the defendant, B & P Motor Express, Inc., that the motor vehicle would be operated by Kelly, or his agent or employee, over the certified route of the defendant, B & P Motor Express, Inc., that the B & P Motor Express, Inc., would pay compensation to the defendant Kelly for the use of the motor vehicle for the transportation services performed, that the defendant Kelly would keep the motor vehicle in good condition and re-

pair and he would pay for all costs and fees of any kind or nature whatsoever which are necessary for or arise from the operation of said vehicle equipment through the points named, that the second party will at all times comply with the rules and regulations of the ICC and that he will comply with applicable rules and regulations of the Workmen's Compensation Act, and that he will pay all state and federal taxes such as unemployment insurance, Social Security, withholding taxes and that the defendant Kelly will reimburse defendant B & P Motor Express, Inc., through deductions or payments for any and all shortage, loss, damage or injury to cargo while in the possession of defendant Kelly, his agents or employees, or fines resulting from violations by defendant Kelly, his agent or employees.

"8.   This lease was executed at the Baltimore, Maryland office of the B & P Motor Express, Inc., by the decedent.

"9.   The decedent, pursuant to the executions of this lease, picked up a load of coils at the marine base at Dundalk, Maryland, returned to the B & P Motor Express, Inc., office where he obtained a bill of lading and then drove to the office of Harold M. Kelly, Inc. at New Oxford, Pa., where he refueled his truck and obtained turnpike tickets.   This was done at the instruction of the defendant Kelly. . . .

"11.   It is found as a fact that the decedent was not carried on the payroll or B & P Motor Express, Inc. but was carried on the payroll of Harold M. Kelly, Inc., the defendant.   Likewise, Social Security, unemployment benefits, withholding tax, workmen's compensation, were the responsibility of the defendant, Harold M. Kelly, Inc.

"12.   The right to fire the decedent rested solely in the defendant, Harold M. Kelly, Inc.   The defendant,

B & P Motor Express, Inc., could refuse to accept the decedent only if he failed to comply with ICC regulations. In the event that the vehicle broke down during the trip under the lease, it was the defendant Kelly's responsibility to repair it or furnish a substitute vehicle as required. If the driver became ill enroute, the obligation was on the defendant Kelly to provide a substitute driver, not that of the B & P Motor Express, Inc. Where B & P Motor Express had alternate routes to the point of destination, the choice of which route was used was left to the choice of the defendant Kelly or the driver. In this case the deceased was under orders to use the turnpike wherever feasible, which orders were given by the defendant Kelly.

"13. The turnpike tolls were paid by the defendant Kelly and, in this particular case, the decedent drove to the defendant Kelly's terminal for gasoline prior to entering the turnpike.

"14. The defendant Kelly had the right to instruct decedent not to go to the B & P Motor Express, Inc., if he wished him not to, he had the right to instruct the decedent as to what speed he was to travel and the right to refuse to allow the decedent to drive Kelly's equipment if he did not meet ICC requirements.

"15. On April 9, 1965, the defendant Kelly furnished the B & P Motor Express, Inc., with a certificate of coverage of Workmen's Compensation insurance on his employees, including Lester Walton."

A few more facts are necessary to complete the examination of who had control and to insure that there is no evidence to overcome the presumption. The record indicates that B. & P. had no interest in who the driver was except that he be qualified by the I.C.C. Further, the record indicates that Walton on his fatal trip did not use the primary routes of B. & P. between Baltimore and Cleveland but used those authorized by

Kelly. Walton stopped at Kelly's office on his way to Cleveland which even further indicates that Kelly had exclusive control. Further, even the lease itself by its terms quoted above gave Kelly responsibility for the truck and giving it to Kelly and its servants for delivery to its destination confirms that exclusive control remained in Kelly.

The Board in coming to its conclusion that the employer-employee relationship existed between B. & P. and the decedent capriciously disregarded competent evidence of essential control by Kelly and the court below properly remanded for further consideration.

Order affirmed.