428 A.2d 1358

**Shirley KELLER, Executrix of the Estate of Harold Keller, Deceased, Appellant,**

v.

**OLD LYCOMING TOWNSHIP, Appellee.**

Superior Court of Pennsylvania.

Argued Sept. 10, 1980.

Filed April 20, 1981.

Petition for Allowance of Appeal Denied Aug. 12, 1981.

Clifford A. Rieders, Williamsport, for appellant.

Richard A. Gray, Williamsport, for appellee.

Before SPAETH, HESTER and CAVANAUGH, JJ.

SPAETH, Judge:

This is an appeal from an order granting summary judgment in favor of Old Lycoming Township and against Shirley Keller, executrix of the estate of Harold Keller, deceased. Keller died on September 15, 1975, as a result of injuries sustained when a ditch he was excavating collapsed. At the time of his death, he was working in a program created under the Comprehensive Employment and Training Act (CETA).[1] His executrix brought wrongful death and survival actions against the township. The township moved for summary judgment on the theory that it was Keller's employer and thereby immune under the Workmen's Compensation Act.[2] Keller's executrix argued that the township was not Keller's employer, but rather that an organization known as "Service, Training and Education Programs"

1. Act of 1973, Dec. 28, P.L. 93–203 § 2, 87 Stat. 839. 29 U.S.C. § 801 *et seq.*

2. Act of 1915, June 2, P.L. 736, 77 P.S. § 1 *et seq.*
Section 481 of the Act provides:
(a) The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employes, his legal representative, husband or wife, parents, dependents, next of kin or anyone otherwise entitled to damages in any action at law or otherwise on account of any injury or death as defined in section 301(c)(1) and (2) or occupational disease as defined in section 108.
(b) In the event injury or death to an employe is caused by a third party, then such employe, his legal representative, husband or wife, parents, dependents, next of kin, and anyone otherwise entitled to receive damages by reason thereof, may bring their action at law against such third party, but the employer, his insurance carrier, their servants and agents, employes, representatives acting on their behalf or at their request shall not be liable to a third party for damages, contribution, or indemnity in any action at law, or otherwise, unless liability for such damages, contributions or indemnity shall be expressly provided for in a written contract entered into by the party alleged to be liable prior to the date of the occurrence which gave rise to the action.
77 P.S. § 481.

(STEP) was.[3] The lower court concluded that by virtue of the borrowed servant doctrine,[4] the township, and not STEP, was Keller's employer. We agree with this conclusion, and shall therefore affirm.

Congress enacted the Comprehensive Employment and Training Act to

> provide job training and employment opportunities for the economically disadvantaged, unemployed, and underemployed persons, and to assure that training and other services lead to maximum employment opportunities and enhance self sufficiency by enhancing a flexible and decentralized system of Federal, State and local programs. 29 U.S.C. § 801.

To accomplish these purposes, the Act allows the Secretary of Labor to make financial assistance available to "prime sponsors,"[5] so that they may "carry out all or a substantial

---

**3.** The amended complaint alleged that "Harold Keller was an independent contractor to the Township and in the alternative Plaintiff's employment was casual in character and not in the regular course of the business of the Township or S.T.E.P." Amended Complaint 6.1. The issues presented by these allegations have not been stated as questions involved. We shall therefore not consider them. Pa.R. App. Pro. § 2116.

**4.** As appellant, Keller's executrix has discussed whether the Township was Keller's statutory employer under 77 P.S. § 52. We do not regard this issue as relevant. We have therefore not addressed it.

**5.** The Act provides:

(a) The Secretary may make financial assistance available to a prime sponsor to enable it to carry out all or a substantial part of a comprehensive manpower program. A prime sponsor shall be—
(1) a State;
(2) a unit of general local government which has a population of one hundred thousand or more persons on the basis of the most satisfactory current data available to the Secretary;
(3) any combination of units of general local government which includes any unit of general local government qualifying under paragraph (2) of this subsection;
(4) any unit of general local government or any combination of such units, without regard to population, which, in exceptional circumstances, is determined by the Secretary of Labor—
(A)(i) to serve a substantial portion of a functioning labor market area, or (ii) to be a rural area having a high level of unemployment; and

part of a comprehensive manpower program." 29 U.S.C. § 812. The prime sponsor in the Old Lycoming Township area was the Lycoming and Clinton Consortium. The consortium subcontracted with STEP to administer certain aspects of the CETA program. *See* N.T. Michael Wilt at 4; N.T. Richard Hritzko at 3–4. STEP acted as an employment office. R. 108a–110a. It enrolled qualified applicants in the CETA program and referred them to potential employers. If the applicants were hired, STEP paid their wages and their workmen's compensation and medical insurance from CETA funds. R. 53a, 55a, 101–103a. CETA workers were entitled to take advantage of a grievance procedure administered by STEP, and to vacations according to a schedule provided by STEP. R. 103–104a. A STEP coordinator

(B) to have demonstrated (i) that it has the capability for adequately carrying out programs under this Act, and (ii) that there is a special need for services within the area to be served, and (iii) that it will carry out such programs and services in such area as effectively as the State; or

(5) a limited number of existing concentrated employment program grantees serving rural areas having a high level of unemployment which the Secretary determines have demonstrated special capabilities for carrying out programs in such areas and are designated by him for that purpose.

(b)(1) A State shall not qualify as a prime sponsor for any geographical area within the jurisdiction of any prime sponsor described in paragraph (2), (3), (4), or (5) of subsection (a) unless such prime sponsor has not submitted an approvable comprehensive manpower plan for such area.

(2) A unit of general local government shall not qualify as a prime sponsor with respect to any area within the jurisdiction of another eligible unit of general local government unless such smaller unit has not submitted an approvable comprehensive manpower plan for such area.

(c)(1) To be eligible for prime sponsorship for any fiscal year, an otherwise eligible applicant must submit to the Secretary a notice of intent to apply for prime sponsorship by such date as the Secretary shall prescribe.

(2) The Secretary may not, prior to March 1, 1974, designate as a prime sponsor, any State or unit of general local government containing another unit of general local government meeting the requirements of subsection (a)(2) of this section unless such smaller unit has submitted to the Secretary written consent for such designation. (Dec. 28, 1973, P.L. 93–203, Title I § 102, 87 Stat. 841.)

29 U.S.C. § 812.

visited the various worksites to ensure that the CETA workers were satisfied, and tried to resolve any difficulties with respect to CETA workers. R. 145a, 167a.

In December 1974, Old Lycoming Township requested a heavy equipment operator from the Manpower Administrator of CETA. Wilt Exhibit # 1. The request was approved, and a job description and recommended pay rate were sent to STEP. STEP referred Harold Keller to the township, and in January 1975, he was interviewed and offered a position in a road maintenance crew. Wilt Exhibit # 10 and 15. Keller worked with, and was supervised by, township personnel until September 15, 1975, when he died as a result of injuries sustained in the collapse of the ditch he was excavating so that a lateral sewer line could be installed for the township. *See* Amended Complaint, # 6.

In deciding whether the township was Keller's employer within Section 481 of the Workmen's Compensation Act, any factual discrepancies are for the trier of fact to resolve; whether the facts as they are determined to exist constitute an employment relationship is strictly a question of law. *English v. Lehigh County Authority*, 286 Pa.Super. 312, 428 A.2d 1343, (1981); *McManus v. Kuhn*, 194 Pa.Super. 544, 168 A.2d 618 (1961); *Potash v. Bonaccurso*, 179 Pa.Super. 582, 117 A.2d 803 (1956); *See also, Barnett v. Bowser*, 176 Pa.Super. 17, 106 A.2d 457 (1954) (whether employment is "casual" is question of law). Accordingly, on the township's motion for summary judgment, all discrepancies in the facts and all reasonable inferences arising from the facts must be resolved in favor of Keller's executrix as the nonmoving party. *English v. Lehigh County Authority, supra; Ritmanich v. Jonnel Enterprises, Inc.*, 219 Pa.Super. 198, 280 A.2d 570; *Schacter v. Albert*, 212 Pa.Super. 58, 239 A.2d 841 (1968).

Recently, in *English v. Lehigh County Authority*, 286 Pa.Super. 312, 428 A.2d 1343 (1981), we had occasion to examine the same general issue as is raised here, and concluded that "[t]he test for determining whether a borrowing employer is an employer for workmen's compensation pur-

poses is whether *the employer controlled, or had the right to control,* the borrowed employees, 'not only with regard to the work to be done but also with regard to their manner of performing it.' " *English v. Lehigh County Authority, supra* 286 at 322, 428 A.2d at 1349 *quoting Venezia v. Philadelphia Electric Co.,* 317 Pa. 557, 559, 177 A. 25, 26 (1935), and *citing Mature v. Angelo,* 373 Pa. 593, 97 A.2d 59 (1953); *Walters v. Kaufmann Department Stores, Inc.,* 334 Pa. 233, 5 A.2d 559 (1939); *Hattler v. Wayne County,* 320 Pa. 280, 182 A. 526 (1936); *Atherholt v. Stoddart Co.,* 286 Pa. 278, 133 A. 504 (1926); *Tarr v. Hecla Coal and Coke Co.,* 265 Pa. 519, 109 A. 224 (1920); *Puhlman v. Excelsior Express & Standard Cab Co.,* 259 Pa. 393, 103 A. 218 (1918); *Walton v. Harold M. Kelly, Inc.,* 218 Pa.Super. 28, 269 A.2d 347 (1970); *Stevens v. Publishers Agency,* 170 Pa.Super. 385, 85 A.2d 696 (1952); *Fanning v. Apawana Golf Club,* 169 Pa.Super. 180, 82 A.2d 584 (1951); *Nilsson v. Nepi Brothers,* 138 Pa.Super. 107, 9 A.2d 912 (1939); *aff'd Nilsson v. Nepi Bros.,* 338 Pa. 561, 14 A.2d 75 (1940). *Frederico Granero Co. v. Workmen's Compensation Appeal Board,* 43 Pa.Cmwlth. 308, 402 A.2d 312 (1979); *City of Monessen v. Workmen's Compensation Appeal Board,* 36 Pa.Cmwlth. 226, 387 A.2d 1000 (1978); *Reasner v. Workmen's Compensation Appeal Board,* 36 Pa. Cmwlth. 292, 387 A.2d 679 (1978); *Grant Builders v. Workmen's Compensation Appeal Board,* 33 Pa.Cmwlth. 591, 382 A.2d 783 (1978); *Barr v. B&B Camper Sales,* 7 Pa.Cmwlth. 323, 300 A.2d 304 (1973).

*English v. Lehigh County Authority, supra* involved a temporary employment agency, Kelly Labor, which for a fee supplied its customers with laborers. It was argued that Kelly Labor should be considered the deceased workman's employer because:

Kelly Labor hired and initially assigned its workers to various customers; it retained the right to fire or discipline its workers; it had exclusive control over the job assignments undertaken by its workers once assigned to a customer; and it paid its workers' wages and unemployment compensation tax, carried its workers' workmen's

compensation insurance, and withheld federal, state and local taxes from its workers' wages. *Id.,* 286 Pa.Super. at ——, 428 A.2d at 1349.

We concluded, however, that because the Lehigh County Authority controlled the activity at the worksite, it was the employer. *Id.,* 286 Pa.Super. at 323, 428 A.2d at 1349–1350. Here, Keller's executrix argues that while Keller worked with and under the supervision of township personnel, see Amended Complaint # 6, he was nevertheless an employee of STEP because of the degree of control that STEP had over a CETA program. In particular, she cites these facts: that STEP paid the CETA workers' wages and medical and workmen's compensation insurance from CETA funds; that it required that its grievance procedures be followed before a CETA worker could be fired; that a representative of STEP visited the worksites to check on problems the CETA workers might be having; and that STEP could terminate a worksite as a place where CETA workers worked. To quote the executrix's brief, "C.E.T.A. has the *power* to control the method or detail of the work . . . ." Appellant's Brief at 28.

■ We agree that STEP did indeed retain considerable control over its CETA funded workers, and we note that the federal government had the power to increase STEP's control over the CETA funded workers to an even greater extent. We remain persuaded, however, that the lower court was correct in its conclusion that the township was Keller's employer. The dispositive fact is that the township controlled the activities at the worksite and directed the conduct of Keller and his fellow employees while they were there.

We are aware that in *Pennsylvania Manufacturers' Association Insurance Company v. Workman's Compensation Appeal Board,* 52 Pa.Cmwlth. 588, 418 A.2d 780 (1980), the Commonwealth Court held that a prime sponsor under CETA was the employer for workmen's compensation purposes of a worker injured at a worksite to which the worker had been assigned. The court recognized that "the most important factor in determining the existence of an employ-

er-employee relationship is evidence of control or of the right to control the work to be done and the manner of its performance." *Id.*, 52 Pa.Cmwlth. at 590, 418 A.2d at 781, *quoting Frederico Granero Co. v. Workmen's Compensation Appeal Board*, 43 Pa.Cmwlth. 308, 311, 402 A.2d 312, 314 (1979). It nevertheless held the prime sponsor to be the employer because the sponsor retained principal control over the funds received under CETA. *Id.* 52 Pa.Cmwlth. at 591, 418 A.2d at 781. Although the court did not elaborate upon its reasons for this conclusion, it evidently viewed control over the *existence* of an employment relationship as equivalent to control over "the work to be done and the manner of its performance." We believe that this view is too broad, and while we do not necessarily disagree with the result reached by the Commonwealth Court in the case before it, which did not involve a common law action, we find ourselves unpersuaded by its reasoning.

Workmen's compensation laws were enacted in response to the common law's failure to meet the needs of workers in an industrial society.[6] Prior to their enactment, an employ-

---

**6.** One commentator has explained limited tort liability for work related accidents as a function of the work place environment that existed in an earlier age:

> Before the days of steam, electricity, and dynamite the workman could protect himself by the exercise of ordinary care. His tools were few and simple. None of them moved except when he handled them and no one was in a hurry. It is, therefore, not to be wondered at that the law gave him no claim for damages unless some fault, at least of omission, could be brought home to the employer.

Walton, *Workmen's Compensation and the Theory of Professional Risk,* 11 Col.L.Rev. 36, 39 (1911). By the late Nineteenth Century, for the ordinary worker such an environment no longer existed. Id. at 39–40.

Another commentator has explained workmen's compensation laws as incorporating a philosophy of cost allocation in that they assume that

> the pecuniary burden [of an injured worker] should be borne not even primarily by the workman; that casualties are an essential feature of industrial undertakings, necessarily recognized as such by both workmen and employers; that this is true even of the negligence of fellow-servants and of the workman himself; that the workman, especially in large undertakings, does not have it in his power to modify the conditions of his service; that the effective

ee was forced to resort to an action at common law to recover compensation for work-related injuries, *see*, Larson, *Workmen's Compensation Law*, v. 1, §§ 4.30–4.50, but such an action was rarely successful, given the common law defenses of the fellow servant doctrine, contributory negligence, and assumption of the risk. *See*, Larson, *Workmen's Compensation Law*, v. 1. § 4.30, Prosser, *Law of Torts*, § 80 (4th ed. 1971); *see e. g., Lehigh Valley Coal Co. v. Jones*, 86 (5 Norris) Pa. 432 (1878) (employees assume ordinary risks of employment including negligence of fellow servants); *Ryan v. The Cumberland Valley Railroad*, 23 (11 Harris) Pa. 384 (1854) (no duty on master to protect servants from carelessness of fellow workers).[7] The states responded to this problem by enacting workmen's compensation laws.[8] The laws represent a compromise: the employee gives up his right to maintain an action at common law; in return, he

force in creating and managing the employment is the employer; that the work is undertaken primarily in the interest of the employer and ultimately in the interest of the public; that the employer can easily transfer to the customer the necessary pecuniary equivalent of any risk; that whatever the primary method of placing the burden, the loss, whether by death or disablement, will be born eventually not by the workman but by society; and that the workman's injury should be relieved without the intervention of charity and on the contrary with a recognition of this relief as a right equivalent to a soldier's right to a pension.
Wambaugh, Workmen's Compensation Acts: Their Theory and Their Constitutionality, 25 Harv.L.Rev. 129, 130 (1911).

**7.** Prosser cites the following estimates of uncompensated industrial accidents before the enactment of workmen's compensation laws: 70 per cent, 1 Schneider, Workmen's Compensation, 2d Ed. 1932, 1; 80 per cent, *Lumbermen's Reciprocal Ass'n v. Behnken*, Tex.Civ.App. 1920, 226 S.W. 154; 83 per cent, Downey, History of Work Accident Indemnity in Iowa, 1912.71; 87 per cent, First Report of New York Employers' Liability Comm., 1910, vol. 1, p. 25; 94 per cent, Report of Ohio Employers' Liability Comm., 1911, part 1, xxxv–xliv. *See*, Prosser, Law of Torts, § 80 fn. 32 (4th ed. 1971).

**8.** All of the states now have workmen's compensation laws. *See*, Prosser, Law of Torts § 80 (4th ed. 1971). For an excellent presentation of the history of workmen's compensation laws in the United States, *see*, Wambaugh, Workmen's Compensation Acts: Their Theory and Constitutionality, 25 Harv.L.Rev. 129 (1911); Walton, Workmen's Compensation and the Theory of Professional Risk, 11 Col.L. Rev. 36 (1911).

recovers for work-related injuries without regard to his own or his employer's fault; the amount of recovery, however, is below that which he might expect if he could obtain an award of damages in an action at common law. *See*, Prosser, *Law of Torts*, § 80 (4th ed. 1971); Larson, *Workmen's Compensation Law*, § 2.10.

■ If one bears in mind that the evil the legislature was addressing by the Workmen's Compensation Act was uncompensated work-related injuries, it is apparent that the employer under the Act is the employer who controls the operations at the work site. It is this employer who can, by the exercise of his power over the operations at the work site, reduce the risk of accidents; it is he who directs the fellow servants of the injured workman, and who would, prior to the Act, have enjoyed the benefits of the defenses of the fellow servant doctrine, contributory negligence, and assumption of risk; and it is the product produced at the worksite that will "bear the blood" of the injured workman, and should therefore reflect the cost of that injury.

■ Here, it was the township, and not the federal government or any agency managing CETA programs, such as STEP, that directed the installation of the sewer line and controlled the operations at the worksite where Harold Keller was injured.[9] The township could most directly af-

9. In her amended complaint Keller's executrix alleged that "[a]t the time, date and place that the cave-in occurred as above alleged, Plaintiff's decedent was employed by S.T.E.P. and was working with and under the supervision of Defendant Old Lycoming Township." Amended Complaint # 6. In her brief, however, the executrix states that "Mr. Keller was absolutely unsupervised by anybody from Old Lycoming Township . . . ." Brief for Appellant at 30. Since there is no evidence contradicting the allegation in the amended complaint, and since the township admitted the allegation in its answer, we accept as fact that Keller was placed under the supervision of Old Lycoming Township. Perhaps the executrix means to suggest by her seemingly contradictory assertions that while Keller was placed under the supervision of the township, the township failed to exercise its responsibility to supervise. This, however, would not change our analysis, for it is the existence of the responsibility to supervise, and not only its exercise, that creates an employment relationship. If in fact the township failed to supervise Keller, that demonstrates,

fect the risks of accidents at the worksite. While STEP also assumed an interest in the safety and other work conditions of CETA workers, it had neither the power nor the responsibility to direct the installation of the sewer line. It could not, for instance, tell Keller's co-workers what ditches to dig, or how to dig them. What it could do was to impose limited sanctions on employers for not complying with its requests. Thus, if an employer did not comply with its directives, it could terminate the worksite as a place where CETA workers could work. This control, however, was too remote and indirect to place STEP in the position of Keller's employer.

It is true that the federal government, through its CETA program, bore the cost of purchasing workmen's compensation insurance for Keller. The fact that the federal government chose to assume this cost does not mean, however, that it had to assume it. Had the federal government not assumed the cost, the township would have had to.[10]

Finally, we note that our decision is consistent with accomplishing the purposes of CETA, namely, to "provide job training and employment opportunities for the economically disadvantaged, unemployed, and underemployed persons." 29 U.S.C. § 801. The obvious reason the federal government undertook to pay the wages and other costs—including the cost of workmen's compensation insurance—was to make it inexpensive for potential employers, such as Old Lycoming Township, to hire a CETA worker. We agree with the lower court that subjecting such employers to actions at

not its lack of authority, but its negligence. See *English v. Lehigh County Authority, supra* 286 Pa.Super. at 324, 428 A.2d at 1350.

**10.** A question of policy may be raised as to the propriety of thus shifting the burden of paying for workmen's compensation insurance, since by so doing, it might be argued, an employer avoids a cost that might otherwise encourage him to promote safety measures at the worksite. However this may be, one may not alter his status as employer under the Act, merely because another party has undertaken the cost of insuring against worksite injuries.

common law would inhibit the CETA workers' employment opportunities. In this regard, we may note an incongruity. Were we to hold that the township was not Keller's employer within the meaning of the Workmen's Compensation Act, and so was subject to an action at common law, the result would be that CETA workers, such as Keller, would be in an entirely different legal position than those with whom they were working side by side. We can see no reason why Congress should have intended such a result.[11]

■■■ The executrix has also argued that the township, as a matter of law, may not take advantage of the Pennsylvania Workmen's Compensation Act because the federal government has pre-empted the field. Brief for Appellant at 57. This argument is without merit. Nothing suggests that the federal government, through CETA or any other legislation, intended to regulate the field of providing injured workmen compensation. *See New York Telephone Co. v. New York Department of Labor*, 440 U.S. 519, 99 S.Ct. 1328, 59 L.Ed.2d 553 (1979); *Exxon v. Government of Maryland, et al.*, 437 U.S. 117, 98 S.Ct. 2207, 57 L.Ed.2d 91 (1978); *DeCanas v. Bica*, 424 U.S. 351, 96 S.Ct. 933, 47 L.Ed.2d 43 (1976). The executrix's argument seems to be that because a federal regulation states that "[o]utstationed participants are still to be considered employees of the employing agency and shall be assured of the same working conditions and

11. Appellant, after submission of briefs and oral argument, cited *Thompson v. United States*, 504 F.Supp. 1087 (D.S.D.1980), for our consideration. This decision is consistent with our holding today. In *Thompson* a CETA trainee, Kitteaux, employed by the Crow Creek Sioux Tribe as a police officer, negligently shot and killed a man in a Bureau of Indian Affairs police station. The court held that Kitteaux was a federal employee for Federal Tort Claims Act purposes. In reaching its decision, the court expressly rejected the notion that Kitteaux was a federal employee because as a CETA trainee he received his pay from the federal government. Instead, the court found Kitteaux to be a federal employee because his "day-to-day" operations were directly supervised by the federal government's Bureau of Indian Affairs. This supervision occurred because he was employed as a tribal police officer and not because he was a CETA trainee. *Id.*, 3–5.

benefits" as similarly situated CETA workers, we must accept the "employing agency" as Keller's employer for workmen's compensation purposes. 29 C.F.R. § 96.23(a)(6). However, just as the characterization of a claimant by an alleged employer does not control our determination of whether an employment relationship existed, *Stevens v. Publishers Agency,* 170 Pa.Super. 385, 85 A.2d 696 (1952), so the characterization in the federal regulation does not control. As we held in *English v. Lehigh County Authority, supra,* the meaning of "employer" under the Act is controlled by the legal interpretation of the Act, as reflected in our past cases, *English v. Lehigh County Authority, supra,* 286 Pa.Super. at 333, 428 A.2d at 1354, and not by the definitions that others care to give to that term.[12]

AFFIRMED.

12. Similarly, appellant's contention, put to us at oral argument, that 29 U.S.C. § 815(a)(1) provides her with support is without merit. This section provides:

(a) The Secretary shall not provide financial assistance for any fiscal year to a prime sponsor unless such sponsor submits a comprehensive manpower plan, in such detail as the Secretary deems necessary, which—

(1) sets forth a comprehensive manpower program which meets the objectives of this title [29 USCS §§ 811–822], including (A) a description of the services to be provided, and performance goals, (B) assurance that such services will be administered by or under the supervision of the prime sponsor, (C) a description of the geographical areas to be served under the plan, and (D) assurances that to the maximum extent feasible manpower services, including the development of job opportunities, will be provided to those most in need of them, including low-income persons and persons of limited English-speaking ability, and that the need for continued funding of programs of demonstrated effectiveness is taken into account in serving such groups and persons;

Appellant argues that "such services" in section (a)(1)(B) refers to the worksites to which CETA employees are assigned. However, it refers to the administration of the CETA manpower program itself.