# Kappas v. Andritz Inc.

C.P. of Lycoming County, no. 98-01,938.

*John Mihalik,* for *plaintiff.*
*Jason Wolfgang,* for defendant Andritz.
*James Wilson,* for defendant HATS.

SMITH, *P.J.,* March 17, 2000— This case arises out of injuries Nicholas Kappas sustained while working at the Muncy facility of Andritz Inc. a/k/a Andritz Sprout-Bauer Inc. Mr. Kappas was placed at the Andritz foundry through HATS, Howe About Temps Inc., a temporary employment agency. Although Mr. Kappas received workers' compensation for his injuries, he is now attempting to sue both Andritz and HATS for negligence. Both companies filed motions for summary judgment, each claiming that as Mr. Kappas' employer, it is immune from suit under the Workers' Compensation Act.

This case presents two matters for the court to decide. The first issue is easy: which company or companies, if any, is Mr. Kappas' employer for workers' compensation immunity purposes? Under Pennsylvania case law, Andritz is the employer and HATS is not. Therefore, HATS may be sued but Andritz may not. The second question is much more difficult, and is a matter of first

impression in Pennsylvania: Does a temporary employment agency have a duty to its applicants, and if so, what is that duty?

## DISCUSSION

Andritz and HATS have both filed for summary judgment, asking this court to dismiss the case against them. A motion for summary judgment may be granted when there is no genuine issue of material fact regarding a necessary element of the cause of action or if, after completion of discovery, the plaintiff has failed to produce evidence of a fact essential to prove the cause of action. Pa.R.C.P. 1035.2. The purpose of the rule is to eliminate cases where a party cannot prevail on a claim or a defense. *Eaddy v. Hamaty,* 694 A.2d 639, 643 (Pa. Super. 1997). If the defendant is the moving party, he must point to materials that indicate the plaintiff is unable to satisfy an element of his cause of action. *Godlewski v. Pars Manufacturing Co.,* 408 Pa. Super. 425, 431, 597 A.2d 106, 109 (1991). In considering a motion for summary judgment, the court must examine the record in the light most favorable to the non-moving party. *Kerns v. Methodist Hospital,* 393 Pa. Super. 533, 574 A.2d 1068 (1990).

Both Andritz and HATS claim they are Mr. Kappas' employer for purposes of workers' compensation immunity. Mr. Kappas contends neither is his employer, and both are fair game for this tort action.

The Workers' Compensation Act provides that recovery under the Act is the exclusive remedy available to employees injured when acting in the scope of their employment. 77 P.S. §481(a). The law obliterated the employee's right to maintain a tort action for these inju-

ries in exchange for what the legislature perceived to be a more equitable and certain system of compensation. *Kosowan v. MDC Industries Inc.,* 319 Pa. Super. 91, 465 A.2d 1069 (1983). Under the quid pro quo established by the Act, the employee gives up the right to sue his or her employer for negligence in return for automatic compensation for the injuries, without having to prove the employer was at fault. *Wasserman v. Fifth & Reed Hospital,* 442 Pa. Super. 563, 660 A.2d 600 (1995).

In determining whether an entity is an employer under the Workers' Compensation Act, any discrepancies in the facts are for a jury to decide; however, whether the facts as they exist constitute an employment relationship is strictly a question of law. *English v. Lehigh County Authority,* 286 Pa. Super. 312, 322, 428 A.2d 1343, 1348 (1981). Here, there are no significant issues of material facts for a jury to decide; therefore, summary judgment is appropriate.

## I. *Andritz' Motion for Summary Judgment*

### A. Borrowed Servant Doctrine

Andritz maintains it is the employer because of the "borrowed servant" doctrine, under which an employee furnished by one person becomes the employee of the person to whom he or she is loaned. The test as to whether a person becomes a borrowed servant is whether the right to control the work and the manner in which the work is performed passes to the borrower. *JFC Temps Inc. v. W.C.A.B. (Lindsay),* 545 Pa. 149, 153, 680 A.2d 862, 864 (1996). The entity possessing the right to control the manner of the performance of the work is the employer, irrespective of whether that control is actually

exercised. *Id.* Although other factors such as the right to select and discharge the employee and the payment of wages may be relevant, the right to control the performance of the work is the overriding factor. *Id.* at 156, 680 A.2d at 865.

It is clear from the record that Andritz had the right to control the manner in which Mr. Kappas performed the work at the Andritz plant. Carl Miller, the team leader of the Cast and Clean Department in which Mr. Kappas was placed, testified in his deposition that when Mr. Kappas arrived at the plant, he took Mr. Kappas to his office and explained when the breaks were, when the dinner hour was, when he was to start cleaning up, and what personal protection equipment he was required to wear. Miller deposition, p. 25. Mr. Kappas testified that Mr. Miller showed him the area in which he was to grind and provided him with ear plugs, a helmet with a face shield, safety glasses, gloves, and a hard hat. Kappas deposition, pp. 40-41. Peter Brandt, plant supervisor, testified that Carl Miller was in charge of training the temporary workers, and that workers were required to wear certain protective equipment. Brandt deposition, p. 27. Mr. Miller showed Mr. Kappas what to grind, explained that he was to "take the lips and edges off," and told him how to do it after Mr. Kappas asked him. *Id.* at p. 42. Mr. Miller testified that he watched Mr. Kappas grinding for 15 minutes. Miller deposition, p. 27. When any new piece was assigned to Mr. Kappas, Mr. Miller would go over it with him and explain what had to be removed. Miller deposition, p. 29. Andritz provided the grinders, as well as the materials to be ground. Kappas deposition, pp. 80-81. Mr. Miller showed Mr. Kappas how to operate the overhead crane and how to lubricate the grinder. Kappas deposition, pp. 42, 68. Mr. Miller was the per-

son with the authority to tell Mr. Kappas if he was not doing a satisfactory job. Kappas deposition, pp. 75, 78, 82. If Mr. Miller was unsatisfied with Mr. Kappas' work, he would first confront Mr. Kappas and then if the problem was not cleared up, would report it to his supervisor. Miller deposition, p. 38. And finally, Andritz had the power to terminate Mr. Kappas. Packard-Howe deposition, pp. 40-41.

Mr. Kappas contends these facts are insufficient to show Andritz had the right to control his work for the following reasons. First, he argues that Mr. Kappas was a skilled employee, and thus the right to control never passed to Andritz because there was no need to train him. In support of this proposition, Mr. Kappas cites *Accountemps v. W.C.A.B. (Myers & Spectrum Arena),* 120 Pa. Commw. 489, 548 A.2d 703 (1988), in which a referral agency supplied skilled accountants to companies. The Superior Court found that the plaintiff accountant already possessed the requisite skills and did not have to be instructed on how to perform her basic job. Thus, the borrowing employer never acquired control over the performance of the work. In *Wilkinson v. K-Mart,* 412 Pa. Super. 434, 603 A.2d 659 (1992), however, the Superior Court unequivocally stated that *Accountemps* does not stand for the principle that the borrowed servant doctrine is inapplicable when the borrowed employee is a specially skilled professional. Instead, the court stated that the *Accountemps* holding was based upon that court's conclusion that the borrowing employer did not exercise the control necessary to invoke the borrowed servant doctrine, and that the skill of the employee was only one of the factors to be considered. *Wilkinson, supra* at 441, 603 A.2d at 662.

Similarly, in *JFC Temps,* the Pennsylvania Supreme Court explicitly rejected an argument similar to the one Mr. Kappas is making. In *JFC Temps,* the plaintiff truck driver did not need to be trained to drive a tractor-trailer, and argued that, based on *Accountemps,* he was not an employee of the trucking company. The Supreme Court held that although the trucking company did not need to teach the plaintiff how to drive a truck, it was still his employer because the company "directed him as to the specifics of the deliveries to be made," and because the driver reported to company headquarters daily and returned there at the end of each workday. *Id.* at 155, 680 A.2d at 865. The Supreme Court, like the Superior Court in *Wilkinson,* held that *Accountemps* is limited to the factual scenario of that case. *JFC Temps, supra* at 158, 680 A.2d at 866.

Similarly, in the case before this court, although Mr. Kappas had some prior experience in grinding, Andritz nevertheless directed him as to the specifics of what was to be ground and what parts were to be removed, as well as specifying his work hours and break times. The court also notes that grinding is hardly a highly skilled profession like accounting, and therefore any parallels Mr. Kappas attempts to draw between the two cases are thin indeed.

Mr. Kappas next argues that the borrowed servant doctrine does not apply because Andritz exercised no actual control over the manner in which Mr. Kappas completed the work. He points out that Andritz did not formally train him, allowed him to choose which grinder to work on and whether to grind in a booth or not, did not spend much time actually supervising him, and did not specify the details of precisely how he was to grind. In this way, Mr. Kappas attempts to compare himself to an indepen-

dent contractor, arguing that Andritz cared only about the finished product, rather than the manner in which Mr. Kappas produced the product.

This argument must fail because Mr. Kappas is doing nothing more than splitting hairs. His argument is similar to that advanced by the plaintiff in *JFC Temps,* who maintained he was not a borrowed employee because, although the company where he was placed told him what truck to use and where to drive it, the company did not specify which route to take. The Superior Court rightly rejected that argument, and so do we. Supervisory personnel need not dictate every move an employee makes in order for their company to be considered an employer.

The record shows that Andritz, through Mr. Miller, told Mr. Kappas what to grind, when to grind, the area in which to grind it, the safety equipment he was to wear, and the machines he was to use. Mr. Miller showed him how to take "the lips and edges off" the materials, how to use the overhead crane, and how to lubricate the grinders. Mr. Miller also watched Mr. Kappas for 15 minutes to make sure he was performing the job properly. Clearly, Andritz exercised control over the manner in which the work was performed. The fact that it did not specify in minute detail precisely how every single step in the process was to be done is immaterial. After all, most employees are permitted to exercise some degree of discretion and independence, as most tasks allow for some flexibility. In a capitalist economy, it pays to allow employees to complete tasks the way they find easiest and most comfortable, for that often leads to the most efficient production. Employers who attempt to dictate every movement of every employee soon find themselves with extravagant management costs and low worker productivity.

Moreover, as discussed above, the overriding factor is the *right* to control the manner of the work performance, rather than the actual control exercised. Thus, in *JFC Temps,* the court concluded that the trucking company was the employer because it had the right to select the routes taken by the workers, even if it did not exercise that right. *Id.* at 158, 680 A.2d at 866. Similarly, in *English v. Lehigh County Authority,* 286 Pa. Super. 312, 428 A.2d 1343 (1981), the court stated that it is the right to control, and not the actual exercise of control, that creates an employment relationship. Although the borrowing employer in *English* did not exercise much control, it could have done so. The court concluded, "The fact that the authority did not exercise such control demonstrates, not its lack of authority, but its negligence." *Id.* at 325, 428 A.2d at 1350.

In the case before the court, the facts clearly show that Andritz could have asserted greater control if it had wanted to or felt it necessary to do so. Mr. Kappas himself admitted that if he was not doing a task correctly, Mr. Miller could have admonished him. Kappas deposition, p. 75. Mr. Miller testified that if a worker's performance was unsatisfactory, including the temporary employees, it was his job to tell the worker and to report the poor performance to his own supervisor, if necessary. Miller deposition, p. 38. And finally, Andritz had the right to terminate Mr. Kappas, an ultimate demonstration of control over a worker's performance. Packard-Howe deposition, pp. 40-41.

For these reasons, the court finds that the right to control the manner of Mr. Kappas' work performance passed to Andritz when Mr. Kappas worked at the Andritz foundry. Therefore, the borrowed servant doctrine ap-

plies and Andritz is immune from tort liability for the injuries Mr. Kappas sustained at its facility.

## B. Judicial Admission and Judicial Estoppel

Andritz also argues it is entitled to summary judgment because Mr. Kappas admitted in a previous federal complaint and his initial complaint in this case that he worked at the Andritz plant as a temporary worker and/or a borrowed employee. We will not consider this statement a judicial admission because it is a legal conclusion rather than an averment of fact, and because to do so would undermine Pennsylvania's policy of allowing liberal amendment of the pleadings. We decline to apply the doctrine of judicial estoppel because Mr. Kappas did not maintain this position in a prior successful action. See *Ligon v. Middletown Area School District,* 136 Pa. Commw. 566, 584 A.2d 376 (1990).

## II. *HATS' Motion for Summary Judgment*

## A. Workers' Compensation Immunity

HATS does not contest that Andritz was Mr. Kappas' employer. Instead, it argues that it too was his employer. There does not appear to be any case on record addressing the question of whether an employee can have more than one employer at the same time, if both have the right to control a person's work performance. However, we need not answer that question because it is clear from the record that HATS did not have that right.

HATS is a temporary employment agency. As such, it interviews individuals, determines what qualifications they possess, and places them in appropriate work situations. HATS provides the weekly paycheck, deducts all

taxes, and pays workers' compensation insurance. It then bills the company at which the employee works for all these expenses, plus a markup. Andritz determined the amount of money paid to Mr. Kappas, and when he would work. Packard-Howe deposition, pp. 11, 41-42. Mr. Kappas would then fill out time sheets, have them signed by his Andritz supervisor, and submit them to HATS, which would process the paperwork and issue the paycheck. Packard-Howe deposition, pp. 25, 30.

While the payment of wages may be considered, it is not determinative of an employer/employee relationship. *JFC Temps, supra* at 153, 680 A.2d at 864. Rather, the overwhelming factor is the right to control the manner in which the work is performed. *Id.* at 156, 680 A.2d at 865. Here, it is clear that HATS did not maintain the right to control Mr. Kappas' work performance once he arrived at the Andritz foundry.

HATS points out that it had the power to terminate Mr. Kappas, and that it had issued a sheet entitled "guidelines" to him, which listed two safety precautions he should take while working. However, Ella Packard-Howe of HATS stated in her deposition that once Mr. Kappas reported to Andritz for work, HATS had no further involvement with him except for payroll and other administrative functions. Packard-Howe deposition, p. 15. She also admitted it was Andritz' responsibility to determine what tools, uniforms, and other equipment were necessary for the work, as well as what safety equipment was required. Packard-Howe deposition, pp. 38-40. And finally, she admitted that Andritz controlled the work of grinding and the manner in which it was to be done. Packard-Howe deposition, pp. 46-47. The temporary agency in *English, supra,* performed similar functions to HATS, yet was found not to be the employer for work-

ers' compensation immunity purposes. The Superior Court held,

"While we agree that Kelly Labor retained some control over its workers, we have nevertheless concluded that the lower court was correct in holding that for workmen's compensation purposes, not Kelly Labor but the authority was English's employer.

"Although Kelly had almost absolute control over which of its workers would service the needs of which of its customers, it had no significant control over the manner in which the workers carried out the work to which they were assigned. Thus, for example, while Kelly Labor was responsible for placing Thomas English into the service of the authority, once he arrived, Kelly Labor did not purport to instruct English on how he should carry out the authority's sewage testing program. That was clearly the province of the authority. Kelly Labor had no supervisory personnel of any kind at the job site; nor did it contemplate training its workers to perform the various tasks to which it assigned them at the request of its customers." *Id.* at 323-24, 428 A.2d at 1349. (footnote omitted)

Similarly, in *JFC Temps, supra,* the temporary agency selected and assigned the employee, paid the salary, had the sole right to terminate the employee, and was the entity to be called if the employee had any questions or was ill. Nonetheless, the Supreme Court held that the temporary agency was not the employer for workers' compensation purposes. And in *Keller v. Old Lycoming Township,* 286 Pa. Super. 339, 428 A.2d 1358 (1981), the Superior Court reached a similar conclusion in regard to STEP, an agency that placed economically disadvantaged persons with employers. In that case, the plaintiff had been sent to work for Old Lycoming Town-

ship. The court found that STEP was not the employer, even though "STEP did indeed retain considerable control over its CETA funded workers, and we note that the federal government had the power to increase STEP's control over the CETA funded workers to an even greater extent." *Id.* at 347, 428 A.2d at 1362. The dispositive fact, however, was that the township controlled the activities of the work site and directed the conduct of the employees while they were there. The case before the court is precisely parallel to the above-cited cases. Even though HATS maintained some control over the worker, the evidence shows that it had no significant control over the manner in which the work was performed once the worker went to the job site. It had no supervisory personnel at the Andritz plant, and there is no indication HATS had any right to interfere with the foundry's operation in regard to the workers it sent there. Therefore, we find that HATS is not Mr. Kappas' employer for workers' compensation immunity purposes, and thus is not entitled to immunity.

### B. Judicial Admission and Judicial Estoppel

HATS also claims it is entitled to summary judgment because Mr. Kappas admitted in his original complaint that he was an employee of HATS. We will not consider this statement a judicial admission because it is a legal conclusion rather than an averment of fact, and because to do so would undermine Pennsylvania's policy of allowing liberal amendment of the pleadings. We decline to apply the doctrine of judicial estoppel because Mr. Kappas did not maintain this position in a prior successful action. See *Ligon v. Middletown Area School District,* 136 Pa. Commw. 566, 584 A.2d 376 (1990).

## C. Negligence

HATS next argues that even if it is not Mr. Kappas' employer, the suit against it must be dismissed either because it owed no duty to Mr. Kappas or because the evidence shows it fulfilled that duty.

This court is not prepared to hold that temporary agencies like HATS owe no duty whatsoever to the individuals they place. Such companies profit from the employees' work, and it is only fair that they shoulder some responsibility for their safety. Temporary agencies have voluntarily entered into a relationship with these individuals, in which they take it upon themselves to assign the workers to facilities where they could be exposed to some danger. The very nature of such a relationship entails an obligation of some sort. The question then becomes exactly what duty HATS owed to Mr. Kappas and the other workers.

### 1. *The duty*

Legal duties are not decreed from on high, nor are they instilled into human nature. They are *created* by judges and legislators. They are artificial constructs which society uses to assign responsibilities between individuals. As Dean Prosser put it, "Duty is only a word with which we state our conclusion that there is or is not to be liability." Quoted in *Troxel v. A.I. Dupont Institute,* 450 Pa. Super. 71, 82, 675 A.2d 314, 319 (1996).

Determining whether a duty exists and defining a duty, then, are nothing more than public policy decisions. *Majestic by Majestic v. Commonwealth of Pennsylvania,* 537 Pa. 81, 85, 641 A.2d 295, 298 (1994). In making these determinations, a court should consider many factors, including the relationship of the parties, whether

the defendant could have foreseen the likelihood of harm, the ability of the defendant to prevent the injury, the cost of avoiding or spreading the risk, the ability of the courts to cope with new litigation, the probability of feigned claims, and the burden on the defendant and the community. *Id.* In the end, says Prosser, the courts will decide if there is a duty based on the mores of the community, "always keeping in mind the fact that we endeavor to make a rule in each case that will be practical and in keeping with the general understanding of mankind." Quoted in *Troxel, supra* at 82, 675 A.2d at 320.

Our job in defining the duty temporary agencies owe to workers is made easier because the people of Pennsylvania have already clearly expressed their ideas about workplace liability in the Workers' Compensation Act. That Act represents a compromise between employees and employers: employees give up the right to sue the employer; in return, they recover for work-related injuries without regard to fault. Although the amount of recovery is lower than what workers might expect from a judicial award of damages, they are spared the time and expense of tort litigation, and can recover whether or not they were fully or partly responsible for the injury.

This scheme was developed for several reasons. First, because the common law failed to meet the needs of workers in an industrial society. Before the days of steam, electricity, and dynamite, workers used a few simple tools, and could pretty well protect themselves from injuries by exercising ordinary care. The law reflected that reality by making it difficult to recover damages from an employer at common law. See the discussion in *Keller, supra* at 348 and n.6, 428 A.2d at 1363 and n.6, citing Walton, *Workman's Compensation and the Theory of Professional Risk,* 11 Col.L.Rev. 36 (1911). The com-

mon law defenses of the fellow servant doctrine, contributory negligence, and assumption of the risk resulted in few successful negligence actions against an employer. *Id.* When industrialization significantly changed the average working environment, the states responded by enacting workers' compensation laws. *Id.*

The primary evil these laws sought to address was uncompensated work-related injuries, but this court believes the intent went much deeper. The laws were also an attempt to achieve economic efficiency—to make our economy maximally productive. Workers' compensation laws help do this in several ways.

First, they recognize that in this industrial age, accidents will happen at the workplace, and that this is the price our society must pay in order to produce certain products. Workers' compensation laws simply seek to allocate the cost of work-related injuries, and attempt to place the greatest burden on the purchaser of those products. They do this by requiring the employer to buy workers' compensation insurance, and assuming that the employer will pass on this cost to the buyer. Moreover, because the price of insurance depends upon the nature of the workplace as well as the number of accidents sustained there, products entailing more injuries will be more expensive. Therefore, consumers will ultimately be the ones to decide how many such injuries they are willing to tolerate through their decision on how much they are willing to pay. Thus, the products that are highly useful or desirable to our society will be produced, while others will not. Meanwhile, products that are safer to produce will not be penalized, and their price will not be significantly increased by the insurance.

This system wisely minimizes the financial risks of producing products that entail considerable workplace

danger because the owners of the plants can anticipate what their liability costs will be, and will not be exposed to weighty personal injury lawsuits. By reducing the possibility of unforeseen financial loss and making the cost predictable, our society eliminates a great deal of the risk involved in such ventures, and thus ensures a supply of such products, some of which are essential to our country's economy.

In addition to encouraging producers to make products that might involve workplace danger, workers' compensation laws also encourage workers to work at such facilities, for they can rest assured they will be compensated for any injuries they sustain with little expenditure of time, money, or effort.

Workers' compensation laws also make the economy more efficient by encouraging businesses to make their workplaces safer, since the cost of their insurance increases with the incidents of injuries. That could ultimately reduce the cost of workers' compensation insurance, and the price of the products—not to mention the added benefit of fewer injuries to workers, which is significant not only for humanitarian reasons but also for economic reasons, because injured workers draw money without contributing to the economy.

Workers' compensation laws also eliminate the potential for acrimony between the workers and their employers and management, which hinders workplace efficiency. Legal disputes all too often create bad feelings between litigants which would result in either the resignation of the worker, which would presumably increase the turnover costs for the employer and financial hardship for the employee, or create terrible tension and hostility at the work site, which naturally decreases productivity. The present system, however, awards compensation without the ne-

cessity of protracted legal disputes over fault. In addition to preserving workplace harmony, workers' compensation laws also save both workers and owners untold money and time that would have been expended in litigation.

And that brings us to what is perhaps the most fundamental purpose behind workers' compensation laws: they take care of work-related injuries quickly, efficiently, and fairly, and allow employees and employers to get on with the business of producing. The system saves everyone time, money, and effort, which can then be spent producing and purchasing products. And that, of course, is what makes our economy hum.

Mr. Kappas now wants us to tinker with the workers' compensation system by imposing liability on temporary agencies when workers suffer injuries at the work sites where they were dispatched. Placing a heavy duty on temporary agencies to ensure the safety of each client's workplace would clearly undermine the goals of the workers' compensation system, which is designed to channel workplace disputes into one procedure and handle them quickly and efficiently. Instead, we would be creating an additional remedy for employees—at least for temporary employees. In addition to collecting workers' compensation insurance from the work site employer, these employees would be able to sue the temporary agency, as well. That throws a monkey wrench into the streamlined process the legislature has carefully crafted, and opens up entirely new avenues for litigation over employee injuries, which is directly contrary to the intent of the Workers' Compensation Act. It also would destroy the system of compromise embodied in the Act: the worker does not give up his or her right to file suit in

regard to the injury, yet still maintains the benefits of compensation under the Act.

Consideration of the additional *Troxel* factors leads us to the same conclusion. Permitting a worker to sue the temporary agency for the negligence of another company would be placing the financial burden of the injury on an entity that has no substantial control over the actual work site, which is not directly responsible for the negligence, and which is not in a position to spread the cost of the risk to the consumer. It could, in fact, impose an unreasonable task on the temporary agencies, which would be charged with the responsibility of carefully inspecting every client's workplace and investigating all safety policies. Temporary agencies are not set up to have expertise in workplace safety, and thus would need to hire individuals who could conduct such inspections. This would require a major investment of time and money which some agencies could not afford. Temporary agencies serve an important purpose in our economy, and this court sees no reason to saddle them with a burden that might well put them out of business or decrease their profits to such an extent as to discourage individuals from establishing and operating such agencies.

Nonetheless, this court is not prepared to hold that temporary agencies have no duty whatsoever toward the individuals they place in employment situations. Such businesses are willingly and knowingly establishing a special relationship with the individuals they place, and are profiting from the work the employees perform. Therefore, they deserve to shoulder some responsibility for their actions. Exactly what type of duty they should owe the workers is the important question.

It would be unreasonable and impractical, in this court's opinion, to require temporary agencies to inves-

tigate in detail the safety of every client's work site. It would also be unreasonable for a temporary worker to assume the temporary agency has done this, and to rely on the temporary agency to ensure his or her safety at the placement site. After all, workplace safety is heavily regulated by various government agencies, and workers should rely on the work of those entities, rather than temporary agencies, to ensure work sites are safe.

It is not unreasonable or impractical, however, to impose upon temporary agencies a duty to refrain from sending workers to a work site which the agency knows or has reason to know is unsafe. Any agency that violates this duty deserves to be liable for injuries to a placed worker, for such an action would be unconscionable. Moreover, it makes sense to impose this duty because if a temporary agency knows a particular place is unsafe, it can easily prevent an injury by not sending a worker there. Such a duty would be simple to comply with, and imposes little, if any, financial burden on the temporary agency. It also creates a clear standard for courts to follow in deciding summary judgment motions like the one before us. The sole question would be whether the plaintiff can show that the temporary agency knew a particular place was unsafe, or whether the information the agency possessed would have led a reasonable person to conclude the facility was unsafe.

Imposing this minimal duty would interfere little with the Workers' Compensation Act, for it would limit negligence suits to instances where the temporary agency sent a worker to a place it knows or had reason to know should be unsafe. Presumably, few temporary agencies do that, and even fewer will do so once such a duty is imposed upon them. Agencies who violate such a basic, minimal duty deserve to be sued, and workers who are

injured as a result of such referrals deserve to recover from the temporary company, for the agency has added insult to their injury.

### 2. *Did HATS breach its duty?*

In sending Mr. Kappas to the Andritz foundry, then, HATS was not guaranteeing the safety of the facility; it was merely guaranteeing that it had no reason to know the facility was unsafe. The record shows that HATS had no knowledge that the foundry was unsafe, nor did it have any evidence that would have led a reasonable person to conclude it was unsafe.

Ms. Ella Packard-Howe, of HATS, testified that before HATS places workers in a light industrial setting, she takes a tour of the plant. Packard-Howe deposition, p. 18. She made two tours of the Andritz plant, one at the beginning of their relationship in 1987, and another in 1997. Packard-Howe deposition, p. 42. She clearly stated that based on what she saw at the plant and the information and knowledge she had of the company, she had no concern about safety issues at the plant. Packard-Howe deposition, p. 43. In fact, she believed Andritz was one of HATS' most safety-conscious clients. Packard-Howe deposition, p. 43. She stated she would never send a worker to an unsafe facility, and had actually turned down clients because she was concerned about their safety measures. Packard-Howe deposition, pp. 43, 52. She did not know of any grinders who had suffered any type of injury while working for Andritz, and none of the temporary grinders she had placed there suffered any serious injury. Packard-Howe deposition, p. 9.

These statements show that HATS adequately fulfilled its duty to Mr. Kappas. In light of the fact that Mr. Kap-

pas has not produced one shred of evidence that HATS knew or had reason to know of unsafe conditions at the Andritz plant, we must grant summary judgment in favor of HATS.

## ORDER

And now, March 17, 2000, for the reasons stated in the foregoing opinion:

(1) The motion for summary judgment filed by Andritz is granted and the complaint against Andritz is dismissed with prejudice;

(2) The motion for summary judgment filed by HATS is granted and the complaint against HATS is dismissed with prejudice;

(3) The motion in limine filed by Andritz is rendered moot and is therefore denied.