Curtis M. GEORGE and Samette B. George, his wife, Plaintiffs,

v.

GPU NUCLEAR CORPORATION, Defendant.

CIVIL NO. 1:CV–91–1147.

United States District Court, M.D. Pennsylvania.

Oct. 16, 1995.

Arnold Levin, Philadelphia, PA, Lee C. Swartz, Hepford, Swartz & Morgan, Harrisburg, PA, for plaintiffs.

John G. Harkins, Jr., Alfred H. Wilcox, Ellen Kittredge Scott, Ellen Kittredge Scott, Pepper, Hamilton & Scheetz, Philadelphia, PA, Lewis S. Kunkel, Jr., Pepper, Hamilton & Scheetz, Harrisburg, PA, Fred Speaker, Camp Hill, PA, Donald E. Jose, David J. Wiedis, Jose & Wiedis, West Chester, PA, for defendant.

### MEMORANDUM

RAMBO, Chief Judge.

The captioned "public liability" action, pursuant to the Price–Anderson Amendments

Act, 42 U.S.C. § 2014, was filed in state court on August 21, 1991, and was subsequently removed to this court pursuant to 28 U.S.C. §§ 1441(a) and 1441(b). Plaintiff Curtis George claims that while employed as a decontamination worker at the Three Mile Island Unit 2 Nuclear Power Plant ("TMI–2"), he was exposed to radiation. Mr. George alleges that he sustained injuries as the result of this exposure. Additionally, Mr. George's wife, Samette, claims loss of consortium. Before the court is Defendant's motion for summary judgment. Defendant argues that it is immune from common law tort liability because Plaintiffs' claims fall within the parameters of the Pennsylvania Workmen's Compensation Act, 77 P.S. § 1, *et seq.;* and, the Price Anderson Amendments expressly prohibit workmen's compensation claims from being litigated as public liability actions. *See* 42 U.S.C. § 2014(w). The parties have briefed the issues and the motion is ripe for disposition.

## I. *Background*

The parties agree upon many of the facts pertinent to resolution of the pending motion for summary judgment. The main source of controversy appears to be the nature of the relationship between Catalytic and GPU Nuclear, and the status of Catalytic employees performing work at TMI. The court, however, is in the undesirable position of having to merely surmise the nature of the disputed facts from Plaintiffs' brief, as Plaintiffs failed to file a counterstatement of material facts as required by Middle District Local Rules 7.4 and 7.8. Accordingly, as stated in Rule 7.8,

the court is bound to adopt Defendant's undisputed statement of material facts.[1]

On March 28, 1979, a "nuclear incident" occurred at the Three Mile Island Unit 2 nuclear reactor.[2] Following the incident, GPU Nuclear[3] began clean-up and decontamination efforts on the Unit 2 reactor. The decontamination effort began in 1980, shortly after the incident, and continued for approximately thirteen years. (Def.'s Reply Brief at 7.) To facilitate the decontamination effort, GPU Nuclear subcontracted with Catalytic, Inc. ("Catalytic"), a labor broker, who supplied workers to GPU Nuclear for the TMI–2 clean-up. (Def.Stmt. of Mat.Facts ¶¶ 1, 5.) Mr. George was employed by Catalytic, and working at TMI, at the time of the incident which gave rise to the captioned action.

Although Catalytic supplied workers for projects at TMI, GPU Nuclear exercised control over all workers supplied by Catalytic, and supervised all projects. GPU Nuclear had the right to hire and fire Catalytic employees, and to originate work assignments for TMI projects. (Def.Stmt. of Mat.Facts ¶¶ 2.b. and 2.d.) Further, prior to gaining clearance to work at TMI, GPU Nuclear required that all potential employees obtain a GPU Nuclear security clearance, and successfully complete a training course. (*Id.* ¶ 2.c.) While working at TMI, all Catalytic employees were subject to the rules, regulations, and disciplinary procedures of GPU Nuclear. (*Id.* ¶¶ 2.e., 2.f., 2.g., 2.j.) All tools and equipment necessary to perform the decontamination work at TMI were supplied by GPU Nuclear. (*Id.* ¶ 2.h.) Finally, GPU Nuclear paid Catalytic for each laborer's

---

1. The court recognizes that completely disregarding statements made by Plaintiffs in their brief could produce unduly harsh results. Accordingly, the court will consider the arguments made and facts proffered by Plaintiffs through their brief and supporting documents. Further, the court will incorporate the facts it extrapolates from Plaintiffs' filings in its discussion. That being said, the court notes parenthetically that, insofar as the facts stated in Plaintiffs' brief and supporting documents are taken as true, they fail to demonstrate the existence of a material factual dispute.

2. The Atomic Energy Act of 1954, as amended, defines a "nuclear incident" as follows:

any occurrence including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, or death, or loss of or damage to property, or loss of use of properties of source, special nuclear, the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material....

42 U.S.C. § 2014(q).

3. GPU Nuclear is a public utility holding company that contracts with Jersey Central Power & Light Company, The Metropolitan Edison Company and Pennsylvania Electric Company to operate TMI and supply electric power. (*See* Pl. Brief in Op. at 1.)

hourly labor rate and the cost of each laborer's workmen's compensation insurance. (*Id.* ¶ 2.i.)

On September 25, 1989, Mr. George was assigned with two other laborers to decontaminate the TMI–2 "flush/burn" facility. (*See* George Depo. at 114.) The "flush/burn" facility is a room in the TMI–2 reactor building utilized during the defueling and cleanup of the damaged nuclear reactor to decontaminate equipment and tools. (Conjar Depo. at 22–24; Def.'s Brief in Support at 10–11.) Persons assigned to work in the "flush/burn" facility were instructed as to procedures to follow if they encountered radioactive fuel debris, as the likelihood of such an encounter was increased due to the work regularly performed in the "flush/burn" facility. (George Depo. at 136–38; Def.Brief in Support at 11.) Mr. George was instructed as to these procedures. (George Depo. at 131–32.)

Prior to sending the decontamination crew into the "flush/burn" facility on September 25, Edward Conjar, a senior health physics technician for GPU Nuclear, surveyed the room for fuel debris and other "hot" items. (*See* Conjar Depo. at 47; George Depo. at 141; GPU Nuclear "Dose Assessment Report for Two Decontamination Laborers Involved With Handling Fuel Debris During a TMI–2 Incident on September 25, 1989," ¶ 3.3 (January 26, 1990) (hereinafter "TMI–2 Dose Report").) As the survey revealed no highly radioactive materials, Mr. George and his partner, Mr. Murphy, entered the facility to begin their decontamination work. (*See* Conjar Depo. at 33–35; TMI–2 Dose Report ¶ 3.3.) While decontaminating, Mr. George encountered a small object wrapped in a teri towel. (George Depo. at 154–61.) According to Mr. George, the object resembled a " 'candy kiss' "—a reference to the manner in which the object was wrapped in the towel. (TMI–2 Dose Report ¶ 3.4 (quoting Mr. George).)

Next, Mr. George picked up the object, briefly examined it, and began to place the object in the radwaste trash bag. (George Depo. at 158–61.; TMI–2 Dose Report ¶ 3.4.) Mr. Murphy told Mr. George not to worry about the object, and that he would take care of it. (TMI–2 Dose Report ¶ 3.4.) It appears that Mr. George then placed the object on the edge of the grating in the mezzanine area of the room. (*See* George Depo. at 162–63; TMI–2 Dose report ¶¶ 3.4, 3.5.) Mr. Murphy then summoned Mr. Conjar and requested that he survey the object. (TMI–2 Dose Report ¶¶ 3.5, 3.6.) Upon conducting the survey and learning that the object was "hot," Mr. Conjar radioed his supervisor for assistance. The supervisor, *inter alia*, "instructed him to locate a plastic bucket, place the object in the bucket, and return it to the Reactor Vessel." (TMI–2 Dose Report ¶ 3.6.)

It is alleged that through his contact with the radioactive material, Mr. George received an extremity dose of radiation. GPU Nuclear has calculated that, based upon the amount of time that Mr. George held the object, he received one of the following approximate absorbed doses of radiation to his right hand:

| | |
|---|---|
| Minimum handling time of 5 sec | = 26 rad[4] . |
| Assumed handling time of 7 sec | = 36 rad |
| Maximum handling time of 11 sec | = 57 rad |

(TMI–2 Dose Report ¶ 4.7.) Translating this information into an equivalent dose, it is estimated that Mr. George received the following exposure to radiation:

| | |
|---|---|
| Whole Body | = 0.238 rem |
| Skin | = 0.291 rem |
| Extremity | = 13.291 rem. |

(TMI–2 Dose Report ¶ 6.2.) Plaintiffs dispute GPU Nuclear's calculations as they contend the numbers are based upon mere estimates. Because the actual object that Mr. George held was thrown back into the reactor, Plaintiffs seem to contend that any dose calculations can be nothing more than speculation. (*See* Pl.'s Brief in Op. at 5–7.)

---

4.  The term 'dose' or 'radiation dose' is a general term denoting the quantity of radiation energy absorbed per unit mass of irradiated material. It is often used to describe either absorbed dose, or dose equivalent.... 'Absorbed dose' refers to the energy deposited in matter by ionizing radiation per unit mass of irradiated material at the location of interest. The common unit for absorbed dose is the *'rad'* 'Dose equivalent' is the quantity used to express the amount of effective absorbed dose for radiation exposure of persons. The common unit for dose equivalent is the *'rem'*. (Aff. of Dr. John R. Frazier ¶¶ 16–18 (emphasis added).)

## II. *Legal Standards: Motion for Summary Judgment*

The court will consider this motion under the accepted standards for the award of summary judgment under Rule 56 of the Federal Rules of Civil Procedure. In *Hankins v. Temple Univ.*, 829 F.2d 437, 440 (3d Cir. 1987), the United States Court of Appeals for the Third Circuit succinctly stated the applicable standards for summary judgment as follows:

> [s]ummary judgment may be entered if "the pleadings, deposition[s], answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, [248,] 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Equimark Comm. Finance Co. v. C.I.T Financial Serv. Corp.*, 812 F.2d 141, 144 (3d Cir.1987). If the evidence is "merely colorable" or "not significantly probative" summary judgment may be granted. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511; *Equimark*, 812 F.2d at 144. Where the record, taken as a whole, could not "lead a rational trier of fact to find for the nonmoving party, summary judgment is proper." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

*Id.* Once the moving party has shown an absence of evidence to support the claims of the nonmoving party, the nonmoving party must do more than simply sit back and rest on the allegations of the complaint. Specifically, the nonmoving party must "go beyond the pleadings and her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file' and designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If the nonmovant bears the burden of persuasion at trial, "the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the nonmovant's burden at trial." *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir.1987), *cert. dismissed,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987).

## III. *Discussion*

█ The decisive issue before the court is whether the captioned action falls within the scope of the Pennsylvania Workmen's Compensation statute. *See* 77 P.S. § 1, *et seq.* (Purdon's 1992). If Plaintiffs' claim is properly characterized a workmen's compensation claim, this court cannot entertain the action. *See* 42 U.S.C.S. § 2014(w). Although the Price–Anderson Amendments state that federal courts may entertain public liability actions arising from nuclear incidents, the Amendments specifically prohibit federal courts from entertaining actions that are more correctly characterized workmen's compensation claims. § 2014(w) ("The term 'public liability' means any legal liability arising out of or resulting from a nuclear incident ... except: (i) claims under State or Federal workmen's compensation acts of employees of persons indemnified who are employed at the site of and in connection with the activity where the nuclear incident occurs...."). The court must now determine whether Plaintiffs' claims present a true public liability action pursuant to the Price–Anderson Amendments, or whether the action should have been brought before the Pennsylvania Workmen's Compensation Board.

█ As correctly stated by Defendant, "the federal rules of decision for this case must be derived from Pennsylvania law to the extent that such state law is consistent with the Price–Anderson Act." (Def.'s Brief in Sup. at 16.) Under Pennsylvania law, an employee may not commence a common law tort action against his employer to recover for an injury obtained in the scope of employment. Rather, the Pennsylvania Workmen's Compensation Act provides the employee's exclusive remedy. 77 P.S. § 481 ("The liability of an employer under this act shall be exclusive and in place of any and all other liability to such employees....") Thus, inso-

far as Mr. George can be classified as an employee of GPU Nuclear, his exclusive remedy is through the Workmen's Compensation Act, not through the captioned public liability action. The court will first consider whether Mr. George was a "borrowed employee" of GPU Nuclear at the time of his alleged exposure to radiation. *See* 77 P.S. § 22.

■■■ "The test for determining whether a borrowing employer is an employer for workmen's compensation purposes is whether the employer controlled, or had the right to control, the borrowed employees, 'not only with regard to the work to be done but also with regard to their manner of performing it.' " *Keller v. Old Lycoming Township,* 286 Pa.Super. 339, 428 A.2d 1358, 1359 (1981) (quoting *Venezia v. Philadelphia Electric Co.,* 317 Pa. 557, 177 A. 25 (1935)). Thus, ascertaining whether Mr. George was a "borrowed" employee of GPU Nuclear turns on the issue of control; specifically, whether Catalytic or GPU Nuclear had the right to control Mr. George in an employment context. *See Joyce v. Super Fresh Food Markets, Inc.,* 815 F.2d 943, 946–47 (3d Cir.1987); *English v. Lehigh County Authority,* 286 Pa.Super. 312, 428 A.2d 1343, 1350 (1981) ("it is the existence of the right to control, and not only its exercise, that creates an employment relationship"); *Keller,* 428 A.2d at 1362 ("The dispositive fact is that the township controlled the activities at the worksite and directed the conduct of [the personnel]."). To evaluate the control issue a district court may consider the following:

> [1] which party has the right to hire and the right to fire, . . . [2] which party has the obligation to pay wages, . . . [3] which party supplies the employee with the tools of her job, . . . and [4] to which party the employee normally reports.

*Joyce,* 815 F.2d at 946 (internal citations omitted). The question of whether the facts before the court conclusively demonstrate the existence of an employment relationship is a question of law to be determined by the court. *Id.* at 947 (quoting *English,* 428 A.2d at 1349). All factual inferences and discrepancies, however, must be resolved in favor of Plaintiffs, the nonmoving parties. *Keller,* 428 A.2d at 1361. The court will examine the four *Joyce* factors to determine whether GPU Nuclear exercised sufficient control over Mr. George to be classified as a borrowing employer for workmen's compensation purposes.

Before proceeding, however, the court must clarify Plaintiffs' misperception of the law controlling the borrowed employee inquiry. Plaintiffs neither dispute nor directly confront Defendant's characterization of the control issue; rather, Plaintiffs conclude that "before reaching the issue of control, Defendant has not met the threshold requirement, the existence of a contract for hire between itself and Plaintiff George, and has not overcome the presumption of continued general employment." (Pl.'s Brief in Op. at 21.) Plaintiffs' interpretation of the law is erroneous.

■■■ As the court has already discussed, the dispositive question with respect to a "borrowed employee" inquiry is which employer exercised the requisite control over the employee. There is no "threshold" requirement that there be either an express or implied contract between the employer and the employee. *English,* 428 A.2d at 1353 ("the law does not require that there must have been a contract of hire, express or implied, between [the employer and employee]"). As explained by the *English* court:

> While it is true as a general proposition that proof of a master-servant relationship is required before the Workmen's Compensation Act will be held applicable, there is no requirement that before a special employer will be held subject to the Act, and therefore immune from an action in trespass, there must have been a contract of hire, either express or implied, between the special employer and the borrowed employee.

*Id.* 428 A.2d at 1351. It is necessary, however, for the court to distinguish "between an individual working under some kind of contractual duty and an individual who is acting as a mere volunteer or simply for the 'fun of it.' " *Id.* Moreover, " 'a workman cannot be loaned to become the employee of another without the workman's consent.' . . . [T]he employee [must] consent to submit himself to

the control and supervision of the borrowing employer." *Id.*

Applying the above stated law to the facts before the court, it is apparent that Mr. George was performing work for GPU Nuclear "under some kind of contractual duty." Mr. George was paid in exchange for the work he performed—he was not decontaminating a nuclear reactor building "for the fun of it." Further, Mr. George, in his deposition testimony, concedes that he submitted to the control and supervision of GPU Nuclear while performing his daily work functions. (*See* George Depo. at 103–111.) The court finds that Defendant has demonstrated that the borrowed employee doctrine is relevant to the matter at hand. As such, the court will proceed with its application of the *Joyce* factors to determine whether GPU Nuclear exercised the requisite control over Mr. George to be characterized as a borrowing employer.

### A. *The Right to Hire and Fire*

In its statement of material facts, Defendant contends "GUP Nuclear had the right to hire the plaintiff, and to terminate his employment at TMI." (Def.'s Stmt. of Mat. Facts ¶ 2.b.) In support of its conclusion, Defendant points to the deposition of Charles Pollard, a former Manager of Radiological Controls Field Operations at TMI–2. During his deposition, Mr. Pollard stated that "GPU Nuclear had the ultimate right to approve or disapprove of the Catalytic employees who were brought onsite to work at TMI." (Pollard Depo. ¶ 7.) Further, Mr. Pollard noted "[i]f any Catalytic laborers refused to obey GPU Nuclear's procedures, they would be subject to GPU Nuclear's disciplinary action, up to and including termination." (Pollard Depo. ¶ 9.) Plaintiffs have offered no evidence which disputes Mr. Pollard's characterizations.

The court finds there to be no material factual dispute as to the issue of control over hiring and firing. GPU Nuclear exercised ultimate control over both of these areas.

### B. *The Obligation to Pay Wages*

Next, the court must consider whether GPU Nuclear or Catalytic was required to pay wages to Mr. George. In its statement of material facts, Defendant contends that "GPU Nuclear paid Catalytic for the number of hours that plaintiff worked . . . [including] his hourly labor rate and the cost of workmen's compensation insurance." (Def.'s Stmt. of Mat.Facts ¶ 2.i.) In his affidavit, Mr. Pollard states the following with respect to the payment of wages:

> GPU Nuclear paid Catalytic for the number of manhours Catalytic's employees worked at TMI, after Catalytic submitted a bill for the number of hours its employees had worked. This compensation included a predetermined billing rate for each employee and the cost of worker's compensation premiums and other expenses. Mr. George was paid by Catalytic for the number of hours he worked at TMI. GPU Nuclear was directly billed for these hours and GPU Nuclear reimbursed Catalytic directly for Mr. George's pay.

(Pollard Depo. ¶ 31.) Plaintiffs have submitted nothing to dispute Defendant's statement of material facts. Nothing in Plaintiffs' opposing brief, nor in Plaintiffs' exhibits in support of the opposing brief, either directly or indirectly addresses the issue of payment of wages. Consequently, the court finds that GPU Nuclear was obligated to pay Mr. George's wages. *See English v. Lehigh County Authority,* 286 Pa.Super. 312, 428 A.2d 1343, 1350 (1981) ("Thus, while Kelly Labor paid its workers' wages and unemployment compensation tax, carried its workers' workmen's compensation insurance, and withheld federal, state, and local taxes from its workers' wages, *it risked none of its own money, for it made these payments from the monies it received from its customers.*")

### C. *Supplying Tools for the Job*

Next, the court will consider whether GPU Nuclear or Catalytic was responsible for supplying the tools necessary for Mr. George to perform his duties at TMI. In his deposition, Mr. George stated that "there was always someone who would carry what they call your supplies with you. It was like a big Herculite plastic bag and which *would supply us* terry towels, Fantastic or some other—It just depended what the contamination

levels were like." (George Depo. at 102 (emphasis added).) Mr. Pollard's affidavit corroborates Mr. George's statement in that Mr. Pollard indicated that "[n]o Catalytic laborers, [sic] are permitted to use their own tools or equipment at TMI. All tools are owned and provided by GPU Nuclear." (Pollard Aff. ¶ 30.)

Because Plaintiffs have failed to dispute, either in their brief or supporting documents, Defendant's assertion that it supplied all the tools incident to Mr. George's employment, the court finds there to be no material factual dispute as to this issue. GPU Nuclear supplied all tools necessary for Mr. George to perform his employment functions at TMI.

### D. *The Employer to Whom the Employee Regularly Reports*

Once he was selected to work at TMI, Mr. George reported directly to supervisors at TMI both to receive work assignments and to receive supervision with respect to completing the assignments. (*See* Def.'s Stmt. of Mat.Facts ¶¶ 2.e., 2.f.) Further, in his deposition Mr. George acknowledged the control GPU Nuclear exerted over all employees through the Radiation Work Permit ("RWP"). (George Depo. at 74–77.) RWP's are issued for every job, and dictate all facets of the job including what the worker must wear, how long the worker is allowed to stay in a contaminated area, and the tools that the worker must use to complete his task. (*See id.*) Thus, the facts show that it was GPU Nuclear to whom Mr. George regularly reported, not Catalytic.

The court finds that there is no material factual dispute as to whom Plaintiff reported. Accordingly, the court finds that Mr. George reported on a regular basis to GPU Nuclear, not to Catalytic.

### IV. *Conclusion*

Application of the *Joyce* factors to the undisputed facts before the court indicate that GPU Nuclear was a borrowing employer of Mr. George at the time of his alleged radiation exposure. As such, GPU Nuclear is immune from tort liability with respect to the nuclear incident, and Mr. George's sole remedy is through a state workmen's compensation action. The express language of the Price–Anderson Amendments dictates that this court cannot entertain the captioned action. Accordingly, the court will grant Defendant's motion for summary judgment. Because the court finds that Defendant was a borrowing employer, the court will not reach the merits of the remaining arguments advanced by either Plaintiffs or Defendant.