Daily Express, Inc. and Pennsylvania National Mutual Casualty Insurance Company, Insurance Carrier, Petitioners *v.* Commonwealth of Pennsylvania, Workmen's Compensation Appeal Board, Caroline Chamberlain and Lewis Noltee, Sr., Respondents.

Argued June 4, 1979, before Judges WILKINSON, JR., ROGERS and MACPHAIL, sitting as a panel of three.

*Wilhelm E. Shissler*, with him *J. Stephen Feinour*, and *Nauman, Smith, Shissler & Hall*, for petitioners.

No appearance for respondents.

OPINION BY JUDGE MACPHAIL, October 12, 1979:

This is an appeal from an order of the Workmen's Compensation Appeal Board (Board) affirming an award of benefits by a referee to Caroline Chamberlain (Claimant) based on her Fatal Claim Petition seeking workmen's compensation benefits from Daily Express, Inc. (Daily), and Lewis D. Noltee, Sr.

Noltee owned two tractor trailers which he leased from time to time to various carriers. On April 14, 1972, Daily and Noltee's authorized agent entered into two agreements (one covering the tractor and one the trailer) by which Noltee agreed to provide Daily with transportation for all loads offered by Daily and

accepted by Noltee. About a year prior to August 1, 1972, Robert Chamberlain (Decedent) was hired by Noltee to operate one of Noltee's rigs which was leased to Daily. On August 1, 1972, the Decedent died as the result of injuries sustained in a motor vehicle accident involving Noltee's rig while on a trip for Daily.

After extended hearings, the referee found that Daily was the Decedent's employer and awarded benefits to Claimant. The Board affirmed. In this appeal Daily contends that the referee's critical findings of fact are not supported by substantial evidence, that the evidence establishes as a matter of law that the Decedent was not an employee of Daily on August 1, 1972, and that the facts and law established that Noltee was the Decedent's employer at the time of the Decedent's death.

Although there is a substantial volume of law pertaining to a determination of employer-employee relationships, one rule remains inviolable: each case must be determined on its own facts. It seems evident from the facts in this case that the Decedent is what our law has come to regard as a "borrowed employee." The leading appellate case on borrowed employees is *Mature v. Angelo*, 373 Pa. 593, 97 A.2d 59 (1953). There, seven principles were enunciated by Chief Justice HORACE STERN as applicable to borrowed employee cases. We summarize those principles as follows: (1) one who is in the general employ of one employer may be transferred to the service of another in such a manner that he becomes an employee of the second employer; (2) whether or not the transferred employee becomes the employee of the second employer depends on whether the first employer passes to the second employer not only the right to control the employee's work, but also his manner of performing it; (3) it is enough to establish the employer-employee

relationship if the employer has the right to control the employee's manner of performance of work, regardless of whether the right is ever exercised; (4) where one is engaged in the business of renting out trucks and furnishes a driver as part of the hiring of the truck, there is a presumption that the driver remains in the employ of his original employer until there is evidence that the second employer in fact assumed control over the employee's manner of performing his work; (5) facts which indicate that an employee remains in the service of his original employer include the original employer's right to select the employee to be loaned and to discharge him at any time and send another in his place, the loaned employee's possession of a skill or special training required by the work for the second employer, and employment at a daily or hourly rate for no definite period; (6) the fact that the second employer designates the work to be done and where it is to be done does not militate against the first employer-employee relationship; and (7) when the facts are undisputed, the determination of who is the employee's employer is one of law, but when the facts are disputed, the determination is one of fact.

Here, we do not believe that there is much dispute with respect to most of the facts found by the referee. However, there is, of course, a substantial dispute over the referee's ultimate conclusion of law. There is substantial evidence to support the referee's findings that: (1) Noltee had no written agreement of employment with the Decedent; (2) that Decedent drove Noltee's rig and received 30% of the gross revenues which the various trips produced less advances for expenses; (3) Noltee paid none of the Decedent's taxes or insurances nor did he withhold any taxes from the Decedent; and (4) Noltee maintained no records relating to driver, cargo, delivery, etc.

There is no doubt, of course, that there was a written lease agreement between Daily and Noltee and that that agreement was quite comprehensive. Although the referee inferred that there was something unfair about the lease because it was prepared by Daily and "certainly they [Daily] were in a better position to understand the terms of said agreement and the responsibilities assumed under said agreement than was the Defendant Lewis Noltee," the fact remains that the lease agreement in unequivocal language states that all drivers engaged by Noltee were solely under his control and direction and that Daily had no authority to direct or control their hiring, discharge or manner of performing their duties. In another borrowed employee case where the Board relied exclusively on a similar lease to determine that the employee became the servant of the second employer by virtue of the provisions of the lease, our Superior Court reversed the Board. *Walton v. Harold M. Kelly, Inc.*, 218 Pa. Superior Ct. 28, 269 A.2d 347 (1970). In the instant case, of course, the referee and Board found the Decedent to be Daily's employee notwithstanding the terms of the lease. However, we agree with the referee that the terms of the lease cannot be read so as to countermand the actual factual situation.

Thus we come to the crucial issues of whether there is substantial evidence in the record to support the referee's conclusion of law that the Decedent was the employee of Daily and whether the referee capriciously disregarded competent evidence by not concluding that the Decedent was the employee of Noltee. The referee found that evidence that Daily required borrowed drivers to pass certain safety clearance procedures, examined their driving records, gave "detailed instructions" on loading and unloading procedures and on driver safety, instructed the drivers on the

preparation and submission of reports and retained the right to accept or reject any driver was sufficient to prove that Daily had the right to direct and the right to control the manner in which the Decedent performed his service.[1] Our review of the record indicates that with respect to the referee's finding that Daily gave "detailed instructions" on how to load or unload a vehicle, the testimony was as follows:

Q. Do you give instructions on how to unload and load the vehicle?

A. Only to the point of the Federal regulations which was going to be brought out but was rescinded.

Q. You did train him, show him how to do it?

A. We talk to them. There is no visual or manuel [sic] training whatsoever. You tell a man to chain the load good and tarp it good and paper it well underneath.

Q. You instruct them regularly in safety precaution?

A. Yes.

Q. They are given instructions on how to safely perform their duties?

A. The best we can.

. . . .

Q. . . . What other things do you instruct the driver as far as safety is concerned?

A. Backing up. Hooking up.

---

[1] We note that Comment c, Illustration 5 of RESTATEMENT (SECOND) OF AGENCY §227 (1957) requires assumption of control by the second employer *and submission thereto* by the borrowed employee before the latter becomes the former's servant and illustrates that a driver may be the employee of his original employer while driving but the employee of his second employer while loading and unloading, for example. There is no evidence in the record before us that the Decedent was doing anything other than driving at the time of his fatal injury.

Q. You teach him how to back up?

A. No, we tell them to be careful, and if you can, get somebody to watch for you when you back up.

. . . .

Q. . . . Claimant's Exhibit No. 1 . . . .

A. Yes, it serves the purpose of instructing the driver what to do.

Q. Does it instruct the driver what to do?

A. It helps the driver perform his duties as an operator.

Q. Are they very specific instructions?

A. Yes.

We are of the opinion that that testimony (and we can find no other) falls short of being substantial evidence to support the referee's finding that Daily gave detailed instructions on loading and unloading procedures and on driver safety. The testimony is likewise equivocal with respect to the other findings of the referee recited in the preceding paragraph. Furthermore, we are not convinced that instructing a borrowed employee on how to obey the law when performing a particular act can make the instructor the employee's employer relative to that act.

Concerning Daily's alleged right to accept or reject any driver, the lease agreement clearly provides that what Daily retained was the right to *reject* any of Noltee's drivers who did not meet and adhere to governmental safety standards. There is absolutely nothing in the record to indicate that Daily ever selected the Decedent as a driver and particularly there is nothing in the record to indicate that the Decedent was selected for the fateful trip when he met his death. Daily operated on a rotating list of drivers. When a driver's name came to the top of the list, *he,* the driver, had the right to accept or reject the trip. There is no evidence in the record to indicate that

Daily ever selected any particular driver for any trip. We fail to find substantial evidence to support the referee's finding that Daily had the right to accept or reject any driver. Having come to the conclusion that the referee's findings are not supported by substantial evidence, we must rule that his conclusion that the Decedent was employed by Daily on August 1, 1972, is in error.

On the other hand, we must presume that the Decedent remained in the service of his original employer absent evidence to the contrary, *Mature v. Angelo, supra,* and we have found such evidence to be lacking in the instant case. We do have a lease agreement between Noltee and Daily which clearly provides that the borrowed drivers shall not be employees of Daily but shall remain the employees of Noltee. Finally, we have the facts that: (1) the right to discharge the Decedent was always exclusively retained by Noltee; (2) the Decedent and Noltee were not paid salaries, but were paid by the trip; (3) Noltee could send another qualified driver in the Decedent's place to drive his rig for Daily anytime he chose to do so, but Daily could not put a driver of its choice in Noltee's rig; and (4) the selection of the Decedent by Noltee to drive a rig in which Noltee had a substantial investment indicates that Noltee must have evaluated the Decedent's skill in the first instance for his own protection before he hired him. From all of the foregoing, we agree with Daily that the facts and the law in this case lead to the conclusion that the Decedent was an employee of Noltee rather than Daily at the time of his death.

### Order

And Now, this 12th day of October, 1979, the order of the Workmen's Compensation Appeal Board dated October 31, 1977, is reversed. It is ordered that judg-

ment be entered in favor of Caroline Chamberlain, widow of the Decedent Robert A. Chamberlain, Jr. and against Lewis Noltee, Sr.

It is ordered that Lewis Noltee, Sr., shall pay compensation benefits to the Claimant Caroline Chamberlain at the rate of $90.00 per week from August 1, 1972, and for so long as Claimant's child Ruth Ann Chamberlain is a dependent of Claimant, but not beyond the child's eighteenth birthday on November 12, 1986.

It is further ordered that the Defendant Noltee shall make direct compensation payments to the Claimant Chamberlain of $76.50 per week from the date that Claimant's child reaches the age of eighteen or is no longer her dependent, whichever comes first, until her marital status changes.

Finally, the Defendant Noltee is directed to reimburse the Claimant Chamberlain $750.00 for burial expenses.

It is further ordered that the Defendant Noltee shall be entitled to subrogation against the proceeds of any third party action and that counsel fees in the amount of $8,500.00 to which Claimant and her attorney, Allen E. Ertel, Esquire, have agreed are hereby approved.