**Stout v. Morrisville Supply Corp.**

*Frank D. Branella*, for plaintiff.
*Gary B. Cutler*, for defendant.

DINUBILE, *J.*, September 14, 2001—This opinion arises from the denial of post-trial motions of defendant Morrisville Supply Corp. and the entry of judgment against it in a negligence action arising from a jury's verdict in favor of the plaintiff, Leroy Stout, in the amount of $2,465,000, as well as the sum of $372,333.18 for delay damages, totaling $2,837,333.18. The jury also found in favor of the defendant against the plaintiff's estranged wife, Carol Stout, in her claim for loss of consortium by awarding zero damages. Two other defendants, Portec Inc. and Labor Ready Inc., settled during the trial, executing a joint tort-feasor release. The liability of Portec was submitted to the jury solely for purposes of determining Morrisville's percentage of liability in the event the jury found both defendants culpable. The liability of Ready was not submitted since the court concluded there was insufficient evidence. The liability of Portec became important in light of the jury's findings. The jury awarded a total verdict of $2,900,000. It found Portec to be 15 percent causally liable in relation to Morrisville. Consequently, the verdict was molded against defendant Morrisville at 85 percent of $2,900,000 ($2,465,000),

reflecting the reduction of 15 percent attributable to Portec.[1]

This was a work site injury. Plaintiff was an employee of Pennsbury Excavating and Landscaping Co. (5/7/01, a.m. session, pp. 8-10.) He was operating a front-end loader in which he was placing pre-stressed concrete into a hydraulic screen plant through what was called a "grizzly." The purpose of the machine was to crush the pieces of pre-stressed concrete, some of which were reinforced with steel. This material then would be removed from the site and sold by the defendant. The hydraulic screen plant carried the material on a conveyer. At some point, the machine jammed. While attempting to stop the conveyer, plaintiff left his front-end loader and was struck in the head by a piece of falling concrete. Plaintiff maintained that as a result of this head injury, he suffers from constant vertigo, imbalance, headaches, brain damage resulting in cognitive deficits, loss of memory and depression. Since age 26, when the incident occurred, he claims to have become disabled. Plaintiff asserted, through his economic expert, that his lost wages and fu-

---

1. Plaintiff has filed cross-post-trial motions seeking a pro tanto reduction in the verdict and entry of judgment in the amount of $2,825,000 with concomitant delay damages. This sum was arrived at by reducing the jury award of $2,900,000 by $75,000, the amount of the settlement with Portec. This motion was denied since the releases executed were pro rata in nature. (5/4/01, pp. 80-83.) Plaintiff cites *Baker v. ACandS,* 562 Pa. 290, 755 A.2d 664 (2000), in support for the pro tanto setoff. This case is not applicable. It involved asbestos litigation and the effect of the non-settling defendant's liability relating to the Manville Trust's share of the verdict. It in no way modifies or changes the law as provided in Uniform Contribution Among Joint Tort-Feasor Act, 42 Pa.C.S. §8326. See also, *Charles v. Giant Eagle Markets,* 513 Pa. 474, 522 A.2d 1 (1987).

ture earning capacity loss ranged anywhere from $1.5 million to $2.9 million.

Plaintiff's major theory against Portec, the manufacturer of the hydraulic screen plant, was in products liability. He asserted that Morrisville, as the supervisor of the work site, was negligent in either creating a dangerous condition in the machine through subsequent modification or, in the alternative, allowing it to be run in a dangerous condition which existed when defendant took control of it. Plaintiff also sued Ready on the grounds that it had supplied unskilled workers to operate the machine. The testimony at trial revealed that employees of Ready on the scene at the time of the accident were not involved in any way in its operation. At best, there had been some testimony that when the machine had jammed on prior occasions, Ready's laborers would assist in its unclogging. As stated, Portec and Ready settled during the course of the trial. Plaintiff also had abandoned his products liability claim at that time. Therefore, the case went to the jury solely on the issue of negligence of Morrisville as well as possible negligence on the part of Portec for failure to erect shields on the conveyer belt. Since there was no evidence of any liability on the part of Ready's supplied laborers, its negligence was not submitted to the jury. The jury also had to consider the contributory negligence of plaintiff himself since there was undisputed evidence that he was not wearing a hard hat at the time that he was stuck on the head by the pre-stressed concrete. He had maintained that he had loaned his helmet to one of the Ready workers because there were insufficient hard hats available for the employees to use. His testimony was corroborated by one

of the Ready employees who testified on plaintiff's behalf. The jury found plaintiff to be negligent, but found no causal connection between it and the harm to him, thus absolving plaintiff of liability.

This case was contested as to all aspects, namely, negligence, causation, contributory negligence and damages. Numerous experts were called on behalf of both sides in support of their respective positions on all of these issues. Plaintiff's principal theory of liability against Morrisville was that it was negligent as to safety concerns in the supervision of the work site. More particularly, there was a dangerous condition contained in the hydraulic screen plant, either created by Morrisville, or if the condition was created by Portec, defendant allowed it to remain. It was plaintiff's contention, through his safety expert, William Halmstadt, that the hopper, the opening leading to the conveyor, enlarged by defendant Morrisville, caused larger pieces of concrete to get into it (conveyor) than was intended. As a result of this enlargement, some pieces of material were too big for the conveyor, resulting in the jamming of the machine and some concrete to fall. Plaintiff's expert also opined that the lack of shields on the conveyor, to prevent the objects from falling, also made the machine unreasonably dangerous to workers as well. This latter theory of negligence was attributable to both Portec in the manufacturing without them and to Morrisville in not correcting this situation. According to plaintiff's theory, the machine jammed because of the enlarged opening. When plaintiff went to stop the machine, a piece struck him, falling from the conveyor because there were no shields. The defense countered that the machine was safe, that

any subsequent modifications made or lack of shields on the conveyor had no bearing on any injury suffered by plaintiff.

The defendant raises several ancillary issues in post-trial motions, such as the qualifications of plaintiff's experts, the contributory negligence issue, insufficient evidence to support the verdict, remittitur, the court's charge as to negligence and mitigation of damages, that the jury was made aware of settlement negotiations during trial to its prejudice as well as certain evidentiary rulings made by the court. It's principal ground, however, is that the defendant is immune from liability under the Workers' Compensation Act pursuant to the borrowed servant doctrine. These issues raised are without merit and will be discussed seriatim.

Defense asserts immunity from liability under the Workers' Compensation Act, 77 P.S. §1 et seq., in that it alleges at the time of the incident, Mr. Stout was a "borrowed servant" of the defendant from his employer, Pennsbury. The law governing this doctrine is well established. The rule was laid out by our Supreme Court in *JFC Temps Inc., v. W.C.A.B. (Lindsay),* 545 Pa. 149, 680 A.2d 862 (1996).

"The test for determining whether a servant furnished by one person to another becomes the employee of the person to whom he is loaned is whether he passes under the latter's right of control with regard not only to the work to be done but also to the manner of performing it. *Hamler v. Waldron,* 445 Pa. 262, 265, 284 A.2d 725, 726 (1971); *Mature v. Angelo,* 373 Pa. 593, 595, 97 A.2d 59, 60 (1953). The entity possessing the right to control the

manner of the performance of the servant's work is the employer, irrespective of whether the control is actually exercised. *Mature,* 373 Pa. at 596, 97 A.2d at 60. Other factors which may be relevant include the right to select and discharge the employee and the skill or expertise required for the performance of the work. *Id.* at 597, 97 A.2d at 60. The payment of wages may be considered, but is not a determinative factor. *Venezia v. Philadelphia Electric Company,* 317 Pa. 557, 177 A. 25 (1935). Although the examination of these factors guides the determination, each case must be decided on its own facts. *Daily Express Inc. v. Workmen's Compensation Appeal Board,* 46 Pa. Commw. 434, 406 A.2d 600 (1979)." *JFC Temps Inc.,* 545 Pa. at 153, 680 A.2d at 864.

This defense is inapplicable because the facts were not clear cut as to whether the plaintiff was either working for his own employer or under the control of Morrisville at the time of the incident. In order to undertake an analysis of this issue, it is necessary to recite the facts involving the employment status of the plaintiff and his employer's relationship with defendant Morrisville. Although every factual aspect of this case was vigorously disputed, the relationship between Pennsbury and Morrisville basically is not contested. Therefore, the borrowed servant issue was a matter of law for this court to decide. *English v. Lehigh Cty. Authority,* 286 Pa. Super. 312, 322, 428 A.2d 1343, 1348 (1981). See also, *Keller v. Old Lycoming Township,* 286 Pa. Super. 339, 428 A.2d 1358 (1981). Both Pennsbury, Morrisville and a third corporation were inextricably interrelated in that Francis Branagan, a major defense witness, appeared to

be involved in the ownership of all three and was both vice president and general manager of the defendant, the third corporation, and plaintiff's employer. (5/1/01, pp. 51-52; 5/8/01, a.m. session, p. 14.) Prior to the incident, Morrisville and the owner of the site in question, Stresscon Inc., entered into a contract for the crushing and removal of the unwanted pre-stressed concrete and other debris from the Stresscon site. Apparently, the subject matter of the contract was waste material which could not be used in Stresscon's business. In return for this service, Stresscon paid Morrisville, permitted defendant to obtain waste material from other sources, bring it to the site, crush it, remove it along with the Stresscon material and sell it. Morrisville also was given possession of this site by virtue of a $1 a year lease between it and Stresscon. Morrisville in turn contracted with Pennsbury to supply heavy equipment operators to load and crush the pre-stressed concrete. In consideration, Morrisville paid Pennsbury in money and/or materials. As stated, Francis Branagan, as vice president and general manager of both companies, was first in charge of the work site. Second in control was one George Seifert, who, according to his testimony, was foreman for Morrisville on the day of the accident. (5/3/01, p.m. session, pp. 35-36.) Branagan, on the other hand, asserted that Seifert worked for Pennsbury at that time. (5/8/01, a.m. session, p. 16.)

Case law, as well as these facts, operate against Morrisville's claim for immunity. The leading Pennsylvania Supreme Court case of *Kiehl v. Action Manufacturing Company,* 517 Pa. 183, 535 A.2d 571 (1987), is

most instructive. The opinion in this case lays out the test to be applied to determine whether a person is working for one company as opposed to another where the ownership relationship between the companies is one of parent and subsidiary or otherwise is interrelated. Where the functions of each corporation are separate and distinct and that the employee was pursuing work on behalf of his employer when injured, then the other company cannot assert immunity under workers' compensation. Here, the functions of both Morrisville and Pennsbury were separate and distinct. Morrisville had contracted to crush and remove the pre-stressed concrete. The function of Pennsbury was to supply heavy equipment operators to collect and crush the material. There is no question that, at the time of the incident, plaintiff was operating the front-end loader pursuant to his employer's contract with Morrisville. Secondly, and most importantly of all, it was not clear cut as to whether Mr. Branagan, as vice president and manager, or Seifert, as the foreman, were working on behalf of Pennsbury or Morrisville when the incident occurred. Under these circumstances, how can Morrisville assert the borrowed servant doctrine when it was not clear for whom Branagan and Seifert were working at the time of this accident? The lines of demarcation between who was working for whom are too vague. See also, *Ashman v. Sharon Steel Corp.,* 302 Pa. Super. 305, 448 A.2d 1054 (1982); *Joyce v. Super Fresh Markets Inc.,* 815 F.2d 943 (3d Cir. 1987).

Two other factors militate against Morrisville in its attempt to assert immunity as the borrowing employer. Plaintiff was a skilled operator of the front-end loader

and the machine itself. He was paid by Pennsbury. Although not conclusive of this issue, these two matters, when added to the unclear lines of command as to which entity controlled or had a right to control plaintiff, lead this court to the conclusion that defendant cannot successfully assert immunity here. If the so-called borrowed servant is a skilled employee requiring a certain expertise to perform the work, it is less likely that the alleged borrowed servant is under control of the party seeking to assert immunity. See *Ashman, supra; Williams v. Delta Truck Body Co. Inc.,* 892 F.2d 327 (3d Cir. 1989). Mr. Stout's function was to operate the front-end loader and the machine in question, if necessary. It was undisputed that he was skilled for these functions. Under these circumstances, it is more likely that when performing these duties he would be subject to the control of his employer. Plaintiff must be given the benefit of these assumptions, since it is defendant who asserts the immunity defense. See *English, supra* at 322, 428 A.2d at 1348-49.

Finally, Judge Spaeth in the *English* case, discussed a requirement of consent, concluding that a workman cannot be loaned out and become the employee of another without consent. See 286 Pa. Super. at 331, 428 A.2d at 1353-54. Although in *English,* and in most of the cases where the borrowed servant doctrine was held to apply, consent was not a factor and was implied because the injured workers in question were hired out as temporary labors, etc., this situation did not exist here. Consequently, the issue of Stout's consent to work for defendant is viable. There is nothing in this record indicating any such consent. As far as plaintiff was concerned, he was work-

ing for Pennsbury. On this fact alone, defendant's immunity claim could fail. For the foregoing reasons, the borrowed servant doctrine is inapplicable. See *Mathis v. United Engineers & Constructors Inc.,* 381 Pa. Super. 466, 554 A.2d 96 (1989).

As stated, defendant raises the following additional grounds for post-trial relief. Defendant attacks the qualifications of plaintiff's safety expert, William Halmstadt, on *Frye* grounds. See *Frye v. U.S.,* 293 F. 1013 (D.C. Cir. 1923); *Commonwealth v. Topa,* 471 Pa. 223, 369 A.2d 1277 (1977); *Blum v. Merrel Dow Pharmaceuticals Inc.,* 564 Pa. 3, 764 A.2d 1 (2000). Morrisville maintains that his testimony should have been precluded and a *Frye* hearing should have been held. It is clear from a reading of Mr. Halmstadt's testimony that he was well qualified to state his opinions. He had a master's degree in occupational safety and health, with extensive experience as a corporate safety consultant. (4/27/01, p. 34; 5/4/01, pp. 40-42.) He certainly was as qualified to testify as defendant's expert, who arrived at an opposite conclusion. The qualifications of, and the opinions expressed by, plaintiff's expert fell well within the acceptable parameters of the *Frye* criteria. The *Frye* test cannot be used to usurp the fact-finding function of the jury. The issue cannot be raised simply because defendant lost the factual battle with plaintiff as to the safety issue.

Morrisville's counsel argued that the cause of this incident was plaintiff's failure to wear a hard hat. In its post-trial motions, it is further argued that as a matter of law there existed contributory negligence on the part of plaintiff. In defendant's brief, this issue was framed as a

duty on the part of plaintiff to mitigate damages. There was conflicting testimony concerning the hard hat situation; defendant maintained that there were plenty of hard hats available and plaintiff was contributorily negligent for failing to wear one. Although the jury found negligence on the part of plaintiff, it concluded that it was not a substantial factor in bringing about harm to him. In arriving at this conclusion, the jury must have determined that he did in fact lend his hard hat to a Ready laborer and there were no extra ones available to him. Or, in the alternative, the injury would have occurred even if he were wearing it. This conclusion that plaintiff was not liable, consequently no duty to mitigate damages was owed, was well within the province of the jury and defendant's post-trial ground that as a matter of law plaintiff was liable must be denied.

The damage issue was as vigorously contested as that of liability/causation. Both sides called neurologists, psychiatrists, psychologists and rehabilitation experts who tested plaintiff, all arriving at diametrically opposite conclusions concerning the cause of his injuries. Since these issues were for the jury, the court, in analyzing the defendant's post-trial motions, is obligated to accept the evidence in a light most favorable to plaintiff. Applying this principle, it must be assumed that Morrisville's negligence was the cause of plaintiff's continuing vertigo, brain damage, disability and depression. Consequently, defendant's general-post trial assertion that there was insufficient evidence presented to support the verdict must fail. Defendant's claim that the verdict should be remitted is also without merit since the jury

found that the injury resulted in total disability of plaintiff, coupled with permanent brain damage, disability and depression.

At trial, defendant took issue with the court's charge on negligence. As stated, plaintiff's theory of liability against Morrisville, as the manager of the work site, was based upon allowing the operation of a dangerous machine on the premises. In accordance with this theory, the court charged the jury that Morrisville, as the supervisor of the project, owed a duty of reasonable care to workers on the site to protect them from any unreasonably dangerous condition. The court then specifically emphasized to the jury that the alleged dangerous condition was the machine in question (the hydraulic screen plant). The court instructed them that they first had to determine whether the machine was dangerous. If so, did Morrisville create this dangerous condition in the machine, make it dangerous, or fail to correct any dangerous condition that may have existed in the machine when it took control of the project? If the latter were the case, the jury was instructed to inquire whether Morrisville knew, or should have known, about this dangerous condition. As stated, the hydraulic screen plant was manufactured by Portec, sold to its distributor, L B Smith, who in turn sold it to a third party. It was then sold by this third party, at the direction of L B Smith, to Pennsbury, plaintiff's employer, by virtue of a lease purchase agreement. The machine was then subsequently altered by a Michael Gatter. He was an employee of a third corporation in which Francis Branagan was also vice president and general manager. It was at Branagan's direction that the machine was so altered.

Defense counsel asserted that the court, in charging the jury on the negligence issue, should have told the jury that Morrisville, in order to be held liable, had to know, or should have known, of this dangerous condition. It is submitted that the court's charge covered this very point. The court specifically stated to the jury that if the machine came to the premises in a dangerous condition, then defendant could not be liable unless it knew, or should have known, about it. It appears that the defense wanted the court to use this terminology as to whether it initially knew that the machine was dangerous. To do so would have been confusing to the jury since the defendant certainly would have known the condition of the machine since the modifications were done at Mr. Branagan's direction. The better approach was that taken by the court in its charge. It instructed the jury that defendant could be found liable in one of two ways. First, by virtue of Morrisville's subsequent alteration of the machine, or if the machine came onto the work site already containing a dangerous condition (*e.g.,* lack of shields on the conveyer belt). Under these latter circumstances, this dangerous condition was not created by the defendant. Therefore, the knowledge aspect became important as to whether Morrisville knew, or should have known, about this dangerous condition. Consequently, the court's charge on this issue was correct.

Defendant takes issue with the fact that its motion for mistrial, made on May 10, 2001, should have been granted. Defendant's counsel asserted, through Mr. Branagan and defense witnesses, that during the trial, two days before, on May 8, 2001, when the court was in

recess due to settlement negotiations between counsel for Morrisville and plaintiff, the jury may have heard or concluded that settlement negotiations were taking place because the judge used the term "settlement," or words to that effect, in close proximity to the jury. (5/10/01 a.m. session, pp. 4-19.) Counsel therefore argued that if the jury knew that settlement negotiations were occurring, they would have been prone to find for plaintiff. The court does not believe that the jury was made aware of the settlement negotiations as a result of any conduct on the part of the court. In any event, the court admonished the jury at least three times thereafter that they were to decide this case based on the evidence presented to them on the witness stand, what they saw, what they heard, what they observed during the course of the trial. The court further instructed them not to consider any extraneous matters not brought up in the courtroom. (5/10/01 a.m. session, pp. 18-19; 5/11/01, pp. 75, 129-30.) In addition, it must be brought to mind that several days before, the other two defendants settled with plaintiff. Their principals, witnesses and counsel were no longer present for the remainder of the trial. The judge, when the trial resumed without them after they had settled, instructed the jury that the fact that these parties were no longer present should in no way affect their decision as to the liability of the remaining defendant. (5/4/01, pp. 80-84.) It is difficult to conceive, under these circumstances, how the outcome of the case was affected by anything that might have occurred during the recess in question. In this day and age, jurors are sophisticated enough to know that there is always a potential for settlement and that

any attempts to do so should have no bearing on their decision.

Defense took exception to the trial judge's refusal to charge on mitigation of damages. Defense wanted this court to instruct the jury that if plaintiff could go back to work, it was his duty to do so since he is under an obligation to mitigate damages. The court, although not using the term "mitigation of damages" in its charge, instructed on this very point. The court told the jury that it would be totally and completely up to them to determine what, if any, amount to award for past loss of wages and future loss of earning capacity. One of the factors in determining what to award was, first, to determine whether Mr. Stout was totally or partially disabled. If they found that he was not totally disabled, then the jury had to determine when, either sometime in the past or sometime in the future, he would be able to go back to work. Consequently, the court's charge was proper.

The defense raises other issues as follows: Defendant asserted that it was surprised and prejudiced by the testimony of Guillermo Burnal M.D., plaintiff's treating physiatrist. He merely testified to the treatment he rendered which was covered in detail by plaintiff's principal treating and medical witness, Emil Matarese M.D., a neurologist. Dr. Burnal's testimony was cumulative at best. Defendant also objects to the testimony of Carol Straiton, plaintiff's physical therapist; asserting that the computer test results concerning his balance problems were beyond her qualifications. This claim is without merit and in any event corroborated by plaintiff's other medical experts and medical records which confirmed Mr. Stout's balance and vertigo maladies.

Defendant maintains that in cross-examining defendant's expert neurologist, Richard Katz M.D., (he testified by way of a videotaped deposition) plaintiff's counsel was permitted to ask him whether he testified for insurance companies and the extent to which he did so. The court permitted some of the questions and sustained others at a hearing prior to its showing. (5/8/01, p.m. session, pp. 68-75.) It is submitted that the rulings were proper, fair and not prejudicial to plaintiff.

Defendant maintains that the court's pretrial order precluding alleged drug use on the part of plaintiff was error. This court disagrees. Plaintiff was hospitalized 12 days for meningitis in late December 1990 to early January 1991. The record was unclear as to whether he tested positive for drugs at that time. Defendant wanted to use this information either to attack his credibility or connect the drug use as the cause of his present injuries. The court disallowed it for two reasons. The fact of drug use six years before the incident was not relevant to the issues present at trial. (See *Commonwealth v. Small,* 559 Pa. 423, 741 A.2d 666 (1999).) Secondly, the fact of use was not firmly established. Thus, a side trial would have occurred as to whether plaintiff used drugs at the time. Under these circumstances, it would have been prejudicial to have allowed it. (4/27/01, pp. 14-18.)

Finally, the defense argues that the court allowed certain plaintiff's experts, namely, Mr. Helmstadt, Dr. Bernal, Dr. Donald Jennings (a vocational psychologist), to testify beyond the "four corners" of their reports. The record belies this contention. Plaintiff's theories and defendant's defense were well known to all parties prior

to trial. For this reason, there were no prejudicial surprises. Since these grounds for post-trial relief are without merit as well, judgment is entered accordingly on the verdict.

## ORDER

And now, September 14, 2001, the post-trial motions of both defendant, Morrisville Supply Corp., and plaintiff, Leroy Stout, are hereby denied. Judgment accordingly is entered on the jury's verdict in favor of plaintiff, Leroy Stout, and against defendant, Morrisville Supply Corp., in the amount of $2,465,000. Delay damages also are assessed in the amount of $372,333.18, resulting in the total judgment entered in favor of plaintiff and against defendant in the amount of $2,837,333.18.

Pursuant to the jury's verdict, judgment is also entered in favor of the defendant, Morrisville Supply Corp., and against plaintiff, Carol Stout.